SECURITY NATIONAL BANK OF KAN-
SAS CITY, KANSAS CITY, KANSAS,
as Assignee of Miller Bros. Construc-
tion Company

v.

The UNITED STATES.

No. 350–62.

United States Court of Claims.

June 14, 1968.

F. Philip Kirwan, Kansas City, Mo., attorney of record, for plaintiff.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM.

This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under Rule 57(a) and the order of reference. The commissioner has done so in an opinion and report filed on October 12, 1967, wherein facts necessary to the opinion are stated. Exceptions to the commissioner's findings of fact and recommended conclusions of law were filed by the plaintiff and the case has been submitted to the court on the briefs of the parties without oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same, as supplemented by the following paragraph, as the basis for its judgment in this case as hereinafter set forth.

We held in J. A. Jones Construction Co. v. United States, decided May 10, 1968, 184 Ct.Cl. ——, that a Government contractor adopts an interpretation of a contract at his peril if it

is not a reasonable resolution of an ambiguity and he does not consult the contracting officer or other representative of the Government about it. That rule would seem applicable to the plaintiff's exceptions to the commissioner's report, herein. Plaintiff relies on its interpretation of the special conditions, SC–6d, stating that during flood periods water would be "temporarily impounded in the reservoir." It took this to mean an inundation of not over 30 days, but this appears to be just the kind of "jumping to conclusions" that generated the trouble in J. A. Jones.

Therefore, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

BENNETT, Chief Commissioner:

Plaintiff, Security National Bank of Kansas City, brings this action as assignee of Miller Bros. Construction Company, which entered into the contract now in question. The assignment of all moneys due under the contract was made November 8, 1956. References hereafter to plaintiff in this opinion are to Miller Bros., the contractor and assignor, unless otherwise noted.

This opinion follows an order of the commissioner for assignment of errors and briefs. Pursuant to Rule 47(c) of the court, the order severed liability and damages, reserving the determination of damages, if any, until liability had been decided. The order further provided that the commissioner's review would be limited to the administrative record, a procedure which had been agreed to by the parties.

The defendant, acting through the Corps of Engineers, Department of the Army, entered into a contract (No. D A–03–050–Civeng–57–231) with Miller Bros. Construction Company of Kansas City, Kansas, on October 26, 1956, for the relocation of 6.6 miles of Missouri State Highway 86, east of Blue Eye, at Long Creek, in southwestern Missouri.

The relocation project was necessary because of the construction of Table Rock Dam on the White River, the completion of which would create a reservoir inundating several roadways and bridges, including the Highway 86 bridge over Long Creek. Long Creek is a tributary of the White River, entering the river a short distance above the damsite. The dam was being built by another contractor about 3½ miles downstream "as the crow flies," and about 10 miles downstream, along the meanders of Long Creek, from plaintiff's jobsite.

Plaintiff's jobsite was divided approximately in half by the creek. Because the work was divided by the creek, it was necessary for the contractor, in conjunction with L. M. Jones Company, Inc., the contractor building the substructure of the bridge, to build a low-water crossing across the small creek to transport men, equipment, and material from one side of the job to the other. Without the low-water crossing, the contractor would have had to move his equipment 65 to 70 miles to get from one side to the other.

The contractor's job was to clear, excavate, fill, grade, lay the base course, and pave the 6.6 miles of relocated highway. A major part of the work involved building embankments for the approaches to the new highway bridge. The embankments were to be built at an elevation of approximately 950 feet above mean sea level. The creek bed, where the low-water crossing was located, was at elevation 800.

The contract, in the amount of $373,870.20, provided that the contractor would begin work within 10 days after receiving notice to proceed, which plaintiff did, and complete the work by November 1, 1957. The contract contained the standard Government contract clauses, including a Disputes clause, a Changes clause, a Changed Conditions clause, and a Suspension-of-Work clause.

The contract also included several special conditions, most importantly SC–6 and SC–6d, which stated:

SC–6. PHYSICAL DATA. Information and data furnished or referred to below are furnished for information only and it is expressly understood that the Government will not be responsible for any interpretation or conclusion drawn therefrom by the contractor.

\*  \*  \*  \*  \*  \*

d. Stream Data. Hydrographs and rating curves for the White River are available for inspection at the Office of the District Engineer, Little Rock District, 300 Broadway, Little Rock, Arkansas. There are no stream flow records on Long Creek. The stream is subject to sharp-crested rises which occur most frequently in the spring. Final closure at Table Rock Dam was made on 9 September 1956 and all river flow is being diverted through the four 4- by 9-foot conduits in the dam which have invert elevations at 722. The conduit capacity is sufficient to pass the flow of White River except during flood periods when water will be temporarily impounded in the reservoir.

In preparing to bid on the contract, one of plaintiff's partners and its job superintendent "walked the job," observing both the site of the relocation and the progress on the dam. At this time, in October 1956, the dam was approximately 68 percent completed, with closure having taken place on September 9, 1956. In preparing the bid, the contractor did not review any of the data which was available, but instead relied primarily on the language in SC–6d of the contract that any floods would be temporary. Plaintiff interpreted this to mean that floods would inundate the low-water crossing for no more than 30 days during the construction period.

The contractor began work upon the notice to proceed and by January 31, 1957, the job was over 2 months ahead of schedule. While experiencing some delays due to wet weather during January, February, and March, the contractor was a month and three-quarters ahead of schedule on April 1, 1957.

During this time, the dam contractor also progressed rapidly at his site on the White River and was the successful bidder for the powerhouse, which was to be built below the dam. Notice to proceed with powerhouse construction was given on February 28, 1957. Commencement of construction on the powerhouse necessitated the closing of the penstocks, or sluiceways, in the dam, which are designed to direct water flow into the powerhouse to generate electricity. Once the penstocks were closed to prevent damage to the construction of the powerhouse, the river-flow had to pass through the four conduits, which could pass the normal flow, as indicated in the contract.

The rainfall in the area in January, February, and March was slightly above average, and on April 5, 1957, the water was backed up from the dam, inundating plaintiff's low-water crossing. The contractor continued to work with little inconvenience, ferrying men across the creek in boats when necessary.

Rain continued to fall, however, with the April total being more than 50 percent above normal. By the end of April the pool had risen to the point where the creek was 40 feet deep at plaintiff's worksite. The May rainfall was also over 50 percent above normal. On May 8, 1957, the Government ordered the plaintiff to discontinue using fill material from one of the designated borrow pits, which in effect forced him to cease a large part of his operation. On May 22, 1957, the flood waters had covered most of the designated borrow areas for fill material, and the contractor on his own shut down his operations and began negotiations with the Government to "underrun," or modify, the contract. After studying the contractor's proposal, the Government rejected it in late July because there would be no benefit in it to the Government. During this time, the contractor worked for other contractors in the area, even though he could have done some work on the relocation in issue.

The flood waters crested at elevation 896.2 on June 10, 1957, and then began to subside slowly. The contractor was notified in mid-September that he could resume work on September 23, 1957. The contractor resumed work in October and continued until January 25, 1958, when he was compelled to shut down by provisions in the contract preventing paving the roadway in cold weather. He resumed work again on May 12, 1958. The contractor had to rip up and regrade much of the roadbed, which had become compacted by traffic and weather.

The contract was completed on February 2, 1959. The contract had been modified several times to extend the completion date a total of 417 days to December 23, 1958. The job was completed 41 days after the modified completion date and $4,100 in liquidated damages were withheld from payments to the contractor.

The rainfall in April, May, and June 1957 totaled more than 24 inches, over 9 inches above the normal and greatest amount for that period on record. The flood itself was comparable to those in 1927 and 1945, the two highest floods recorded.

The contractor first asserted claims in August 1957. The contracting officer rendered an adverse decision on these claims in July 1959. Additional claims were filed in September 1959, which were denied in the contracting officer's supplemental decision in January 1960. A second adverse supplemental decision was rendered in July 1960 on a claim asserted in May 1960.

These adverse decisions were appealed and a hearing was held before a member of the Corps of Engineers Board of Contract Appeals February 14–17, 1961. On November 9, 1961, the board rendered decisions on several claims (Eng. BCA No. 1699), not all of which were brought to this court. The board held that the flooding of the low-water crossing did not constitute a suspension of work because the contractor's perform-

ance was not delayed or hindered by the flood between January 1 and May 8, 1957. The board further found that there was no suspension of work because of Government delay or bad faith in regard to the negotiations to modify the contract after the flooding began. The board did grant the contractor a lump-sum adjustment for a partial 6-day suspension between May 8 and May 22, 1957, arising from the Government's stop order on May 8.

The board found that claims arising under the changes and changed conditions clauses were also without merit. These decisions were based on the finding that the flooding which caused the delay was caused by an act of God for which the Government is not responsible.

The board denied a claim under the possession prior to completion clause on the basis of a failure of proof.

The board remanded to the parties a claim for damages to permanent work because no decision on that matter had been reached by the contracting officer.

From the board's decision, the plaintiff brings two assignments of errors of law. Plaintiff does not take issue with the board's findings of fact on which these alleged errors of law are predicated but, conversely, states that it does not believe the board ruled adversely to it on the relevant facts.

Plaintiff raises its assignments of errors in terms of breach of contract not claimed in the administrative proceedings. Plaintiff first claims that the Government breached the contract by misrepresenting that the work area would remain dry for a "temporary" period, while, in fact, the flood lasted 5½ months. Plaintiff's second assignment is that the Government breached by not alleviating the flooding in the work area by either delaying completion of the dam or delaying the letting of the powerhouse contract.

■ The case is now before the court on a Wunderlich Act review. It is clearly established by the controlling precedents that if the issues now raised as breach of contract could have been determined under the provisions of the contract, labeling the errors "breach" will not give the plaintiff a de novo hearing in this court. Morrison-Knudsen Co. v. United States, 345 F.2d 833, 837–838, 170 Ct.Cl. 757, 763–764 (1965). This is true even where the issues are errors of law, as plaintiff has designated them in this case. Morrison-Knudsen Co. v. United States, supra. See also United States v. Utah Const. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). Both of plaintiff's claims, as will be seen, could, if valid, have been adjusted and relief provided under terms of the contract, and this determination is based solely upon consideration of the administrative record filed with the court.

*First Assignment of Error*

■ Plaintiff's first assignment involves the interpretation of SC–6d of the contract, quoted above, and more particularly the meaning of the word "temporarily." It is a well-established principle that questions of interpretation of a contract are questions of law to be determined by the court. See Morrison-Knudsen Co. v. United States, supra. The Wunderlich Act, 68 Stat. 81, 41 U.S. C. § 322, provides that no administrative decision on a question of law may be made final by terms of the contract, thus leaving to the court the ultimate determination of questions of law.

Plaintiff asserts that "temporarily" as used in SC–6d to describe possible flooding was a misrepresentation because: (1) it was reasonable for plaintiff to have anticipated no more than 30 days of flooding in the work area; (2) the hydrographs referred to in SC–6d were "worthless" in anticipating the prolonged flooding; (3) the Government anticipated that plaintiff's work area would be flooded out for as long as 4 months and failed to warn plaintiff; (4) the work area was flooded for 5½ months; and (5) the prolonged flooding

was caused by dam progress rather than an act of God.

The plaintiff raised, and the board considered, this claim under the changed conditions clause of the contract. After reviewing the facts, the board held in Appeal of Miller Bros. Constr. Co., ENG BCA No. 1699 (November 9, 1961), at page 22:

> The identical facts, circumstances, contract provisions and changed conditions arguments were advanced in the appeal of L. M. Jones Co., Inc., Eng BCA 1507 (1959), and considered by the Board. That appeal was denied on grounds that the flood was an Act of God, of unpredictable magnitude against which contingency the contract did not warrant and for which the Government is not liable, citing authorities. We endorse and reaffirm that decision as controlling this claim, which is herewith denied.

The *Jones* case involved the contractor who was building the substructure of the new bridge over Long Creek to accommodate the road which plaintiff was relocating. The identical contract specification regarding flooding was used in both the *Jones* contract and plaintiff's contract.

The *Jones* decision, Appeal of L. M. Jones Co., ENG BCA No. 1507 (1959), was brought to this court and submitted for decision on the administrative record, L. M. Jones Co., Inc. v. United States, 178 Ct.Cl. 636 (1967).

Plaintiff in that case raised the same issue with regard to the interpretation of "temporarily" in the contract. The court held in L. M. Jones Co., Inc. v. United States, supra at 654:

> Finally, it cannot be said that, considered in the context of the known date of Dam closure and the teachings of the hydrographic data, the contract reference to temporary impoundment was either a misrepresentation of future conditions to be reasonably anticipated or a warranty that the plaintiff's work site would remain essentially dry. Taking account of the entire content of paragraph 7c of the Special Conditions [paragraph 6d in the present case], together with the disclosures made thereby, the temporariness referred to must be understood to mean no more than nonpermanent.

In the circumstances of this case, the plaintiff's admitted and unexplained failure to consult the relevant extrinsic data to which it was specifically referred by its contract is fatal to a claim of liability based on an asserted Government breach of contract representations. A contractor cannot call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitation to bid. Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 312 F.2d 408, 414 (1963); Leal v. United States, 149 Ct.Cl. 451, 460, 276 F.2d 378, 383 (1960).

█ In the present case plaintiff also failed to consult the available data. The *Jones* rationale is clearly controlling here. In addition, it must be emphasized that paragraph SC–6, quoted above, clearly relieves defendant of responsibility for interpretations and conclusions drawn by the contractor from information made available by defendant. Such a general disclaimer will not overcome a positive misrepresentation, but none is found here. Cf. 2 McBride & Wachtel, Government Contracts § 13.110 (1964). The specifications warned plaintiff of the possibility of flood and of the limitation of the conduits.

But, plaintiff argues that even if all the data had been consulted, it would not have indicated the possibilty of extensive flooding. Plaintiff in the *Jones* case raised this argument involving the same data, and the court disposed of it by saying at page 653: "Had plaintiff consulted this data, as did defendant, then plaintiff would have known that the threat of flooding existed." Under identical circumstances, the same result obtains in the present case.

Plaintiff further argues that the Government anticipated the flooding and failed to warn plaintiff. This allegation is based on an interoffice memorandum written by the contracting officer to the Corps of Engineers division engineer on October 5, 1956. Plaintiff alleges that the Government failed to apprise it of contents thereof which refer to possible flooding, because of the progress on the dam, and the flood records on White River. The plaintiff in L. M. Jones Co. v. United States, supra at 651–653, raised the same issue. The court found that there was no indication that the Government's fears about possible flooding were based on anything other than information available to the contractor—the hydrographs and date of dam closure. The transcript and exhibits in the present case likewise do not indicate that reliance was placed on anything but the same information. It must be concluded here, as in *Jones,* that this is not a situation in which defendant withheld material facts from plaintiff. On the contrary, a reading of the document in question clearly shows that defendant was of the opinion, though mistaken, that the location of the new Highway 86 at the worksite was sufficiently high to avoid trouble due to high water.

Plaintiff also challenges the board's finding that the flooding was an act of God, asserting instead that the construction of the dam caused the prolonged and abnormal inundation. The board found that the flood was comparable to the highest on record, with total rainfall for April, May, and June 1957 being the greatest amount for that period in any one year. Finally, the board found that the dam construction, which was about 10 percent ahead of schedule, was "normal."

Plaintiff had investigated the damsite before the contract was let and was aware of the general progress of the dam. The contract specifications set out the date of dam closure. The act of God must be considered in light of the fact that the dam did exist, as plaintiff was aware. If there had been no dam, the flood would not have reached the proportions it did, but the dam was closed before plaintiff was awarded the contract.

■ Considering the board's finding in light of Wunderlich Act standards, it cannot be said on the record as a whole that the determination that the prolonged flooding was caused by an act of God was "fradulent (sic) or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." 41 U.S.C. § 321.

The board decision may be considered not to be arbitrary and to be supported by substantial evidence even though there may have been evidence before the board upon which it could have reached a different result. River Const. Corp. v. United States, 159 Ct.Cl. 254, 261 (1962). It is hard to see, however, how this board could have held other than it did on the evidence before it.

■ Plaintiff received extensions of time totaling 417 days, a period longer than the original contract period of 1 year, for the delay caused by the flood. The defendant is not liable in damages for delay caused by acts of God. Arundel Corp. v. United States, 103 Ct.Cl. 688, 712 (1945), cert. denied, 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451, rehearing denied, 326 U.S. 808, 66 S.Ct. 166, 90 L.Ed. 493; Amino Bros. Co. v. United States, 372 F.2d 485, 490, 178 Ct.Cl. 515, 524 (1967), cert. denied, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112. Defendant is not an insurer for plaintiff against acts of nature. Banks Const. Co. v. United States, 364 F.2d 357, 176 Ct.Cl. 1302 (1966). The relief given plaintiff by the contracting officer in extending the time for completion was the proper and sufficient procedure under the contract and the facts.

### Second Assignment of Error

Plaintiff's second assignment of error is that the Government breached the contract by failing to alleviate the flooding by (1) deferring completion of the

dam or (2) delaying letting the power-house contract and leaving the penstock openings uncovered.

Plaintiff brought this contention before the board under the changes and changed conditions clauses of the contract. The board held that a supervening act of God caused the delay; that the dam was in existence at the time the contract was let, before the flood, and that plaintiff knew it; and that the structure functioned as a dam during the flood "simply because it was there."

If the Government had compelled the dam contractor to delay operations by leaving part of the dam low, as was discussed in the fall of 1956, it would have delayed dam completion for nearly 5 months and would have cost the Government at least $509,000 for the contractor's fixed costs. The dam contractor estimated that the total cost of the delay could approach a million dollars. This delay, as considered by the defendant, would have alleviated the flooding to some extent, with the water receding below plaintiff's low-water crossing in early August rather than mid-September.

The defendant in late April again explored the possibility of delaying construction on the dam. By then the dam elevation was much higher than the elevation of the low-water crossing, and a delay at that point would have had little effect on the flood. The cost of this delay would have been between $50-000 and $150,000, depending on how many of the blocks in the dam were left low.

It is clear from the record that delaying dam construction would not have significantly alleviated plaintiff's problem even if the decision to delay had been made in 1956 when flooding was considered only a possibility. It is unreasonable to contend that the Government should have made that decision to prevent, at a very high cost, what was at best a speculative possibility that plaintiff's worksite would be flooded out for longer than usual.

The board's findings in this area sparse, and are conclusions without discussion of the underlying facts. But it is clear, from the record as a whole, as discussed above, that the board's conclusions that the Government could not have reasonably alleviated the condition, once the flooding began, by delaying construction, or could have reasonably been expected to delay construction before the flooding began, are not arbitrary or capricious, and are supported by substantial evidence.

Plaintiff could have been given relief under the contract had the facts indicated a valid claim existed. In Hoffman v. United States, 340 F.2d 645, 166 Ct.Cl. 39 (1964), the court held that diversion of water caused by a man-made upstream dam was a changed condition and plaintiff was entitled to an equitable adjustment under the changed conditions clause of the contract. The diversion was caused by the acts of another contractor and, it was held, could not have reasonably been foreseen by plaintiff. Defendant could reasonably have prevented the difficulty and was obligated by the contract to compel cooperation of the offending contractor. In the present case, if the continued construction of the dam rather than an act of God had caused plaintiff's delay, and if plaintiff could not have foreseen this, and if the continued construction was not reasonable under the circumstances and defendant could have stopped or delayed it, plaintiff could have received an equitable adjustment under the contract. But, in the instant case, the supervening act of God, a major flood of a magnitude unexpected by everyone, caused the damage. Nor will the theory of constructive suspension under the suspension-of-work clause of the contract help plaintiff for the Government's actions were not unreasonable in refusing to delay the dam construction. Defendant granted plaintiff a substantial time extension and that was all it was bound to do here. John A. Johnson & Sons v. United States, 180 Ct.Cl. 969 (1967).

 As to the powerhouse contract and the penstocks, the board held in Appeal of Miller Bros. Constr. Co., supra at page 24 that:

The simple and sufficient fact about that incident is that on 28 February [1957, when notice to proceed on the powerhouse was given] there was no flood and none of abnormal proportions was expected. As the findings in the changed conditions claim * * * show, the flood of April, May and June was a surprise to everyone, and all suffered alike, the Government, M–K [Morrison-Knudsen, the dam contractor], Jones, and other contractors, as well as appellant.

As soon as construction began on the powerhouse, the penstocks had to be closed to prevent damage to the construction area, since the powerhouse was being built on the downstream side of the dam. The board's finding that the Government did not act improperly in awarding the powerhouse contract meets the Wunderlich tests.

There was no way for the Government, or anyone else, to anticipate the record rains which caused the flooding. Plaintiff knew from the contract specifications that after dam closure on September 9, 1956, all river water would have to pass through the four conduits, and had no reason to expect that the powerhouse contract would not be let, or that the penstocks would not be closed. The penstock gates were actually put in place 3 weeks before the notice to proceed on the powerhouse was given. The dam contractor's action in putting them in at that time was compelled by his contract. The gates were held in place by water pressure and could not then be raised once they were put into place. At a later stage of construction, installation of proper machinery and devices would permit opening of the gates.

This evidence clearly supports the board's finding that the flooding could not have been alleviated by removing the penstock gates, since there was no practical way that the gates could be removed at this stage of the dam construction, once they were wedged in place. The board's determination here also withstands Wunderlich scrutiny.

### Other Issues

Although not specified in the assignments of errors, plaintiff in its brief makes claims for extra costs of construction incurred as a result of the delay, and for remission of the liquidated damages assessed against it. Plaintiff premised these claims on the conclusion that the Government had committed a breach of contract by misrepresenting work conditions at the jobsite. Since it has been determined, supra, that the Government is not guilty of misrepresentation, these claims are denied.

### CONCLUSION OF LAW

Upon the foregoing opinion, which includes therein a statement of the facts, and which is adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover. The petition is therefore dismissed.