**HARDEMAN–MONIER–HUTCHERSON,**
a Joint Venture

v.

**The UNITED STATES.**

No. 353–70.

United States Court of Claims.

May 12, 1972.

John S. Battle, Jr., Richmond, Va., attorney of record, for plaintiff. McGuire, Woods & Battle, Richmond, Va., of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This opinion was prepared by Judge Collins before his death and has been adopted by the court.

The facts in this Government contract case are not in dispute. They are set forth below as they appear in the decision of the Armed Services Board of Contract Appeals (hereinafter ASBCA

or board). The case is before the court on the parties' cross-motions for summary judgment.

Plaintiff, Hardeman-Monier-Hutcherson, is a joint venture consisting of American and Australian corporations. In mid-July 1963, after competitive bidding, plaintiff was awarded a contract at a fixed price of $34,880,000 for the first increment of the construction of a radio communications facility for the United States Navy at North West Cape, Western Australia.

North West Cape is located at the confluence of the western side of Exmouth Gulf with the Indian Ocean. It is an area remote from the population centers of Australia, and prior to the inception of this project the area was uninhabited. The nearest city, Perth, is located 850 miles to the south.

Among the items of work to be constructed was a pier, approximately 1,100 feet in length, extending from the shore into the Exmouth Gulf in an easterly direction. Due to the remoteness of the site, it was contemplated that the pier would be utilized by plaintiff, as well as by other contractors, for the offloading of ships carrying equipment, materials, and supplies. Thus, the construction of the pier was of vital importance to the completion of the entire project and, for this reason, it was given a relatively short construction time of 360 days. Liquidated damages in the amount of $600 were to be assessed for each day of unexcused delay beyond the "usable completion date" fixed at July 13, 1964. The pier was actually accepted as usably complete on January 3, 1967. However, the contracting officer extended the completion time 334 days, due to excusable delays.

The beaches around North West Cape and its vicinity are fronted with coral reefs. There is relatively deep water close inshore at Point Murat, which projects into Exmouth Gulf approximately 2.5 miles southeast of the tip of North West Cape. Prior to the invitation for bids and during the project design period, various studies were made to decide upon the location and design of the pier. Between July 6 and 31, 1961, at the request of the United States Navy, soundings were taken in the area southward of Point Murat by the Department of Public Works of Western Australia. This was done by the crew of the department's vessel "Gunga Din," under the command of Captain Piggford. Due to bad weather and rough seas, the crew took 25 days to complete the task instead of 2 weeks, as Captain Piggford had originally estimated. Captain Piggford reported, in part:

3.1. Considering Area "A", the area at Point Murat in which the proposed jetty or pier is to be sited—

From a general hydrographic and navigational viewpoint, the site has some obvious advantages—

(i) Protection from winds and sea from S.W. to N.W.

(ii) Deep water comparatively close inshore.

(iii) Relatively deep and clear approaches.

3.2. Disadvantages perhaps not so obvious are—

(i) Pt. Murat is a point of convergence for tidal streams of velocities up to $3\frac{1}{2}$ feet per second, causing overfalls [1] on both ebb and flood tides.

(ii) In the southern winter season, winds are mainly N.E. to S.S.E. This area is exposed to all winds from N. to S. through east with a fetch of 25–30 miles or more in practically all of these directions.

This, combined with the overfalls mentioned in (i) above can set up an unpleasantly rough sea on occasions.

---

[1]. Webster's Third New International Dictionary (1965) defines overfall as "a turbulent surface of water caused by strong currents setting over submerged ridges or shoals or by winds opposing a current" and "a sudden increase of depth in the bottom of the sea or other large body of water."

(iii) It is an evident fact that the advantages outlined in 3.1. (ii) and (iii) are due to the scouring action of strong tides and to the exposed nature of this corner.

3.3. It follows that the further south, away from the point, that the jetty or pier can be constructed, the better will be the conditions for it.

Notwithstanding this unfavorable report, the United States Navy chose as the pier site a location approximately 800 feet south of Point Murat. Captain Piggford had ceased his soundings without covering the entire pier site because, in his opinion, no one would build a pier at that location due to the severe weather and sea conditions.

The "Gunga Din" returned to Exmouth Gulf on June 13, 1962, this time under the command of Captain Drexel, for the purpose of taking additional soundings and core borings at the site. As before, the survey work was repeatedly delayed and the ship and crew were endangered by bad weather and rough seas. Finally, on August 17, 1962, the second survey was completed. This resulted in a report of the Senior Engineer, Harbours and Rivers Division (hereinafter the Drexel report), which contained the following comments:

It was unfortunate that the timing for this job entailed working on the west side of a very large Gulf during the seasonal period of SE, E & NE winds, with regular intensities of 20 to 30 knots.

\*     \*     \*     \*     \*     \*

2. The location does not commend itself for floating plant operation.

Aspects to be considered are:

(a) The mass of coral outcrop projecting from the seabed, some as high as 6 feet, inside the wharf face, render the moving of mooring wires and chains difficult, and navigation hazardous.

(b) Although we found a reasonably protected area for mooring our 40′ workboat, draft 4′9 behind the reef line, the water depths are the absolute minimum and further restricted by odd outcrops of coral. Heavy floating plant would require larger tug power, for which there is no safe mooring area. Cyclones would render the whole water area particularly dangerous and impossible for moored craft. Short term use of floating plant at selected times of the year would be practicable, the plant being removed from the area outside these periods.

It would have been quite impracticable to drive piles from floating rigs during the period the "GUNGA DIN" was at Exmouth, except for the odd small number of calm days.

Captain Drexel also measured currents along the face of the pier on several days in mid-July. He found such currents to range from approximately 2.5 to over 4 knots on ebb tide.

The invitation for bids was accompanied by a document entitled "Information for Bidders," which contained the following:

1. The following is furnished as general information to prospective bidders. This does not relieve bidders from the need for making site inspection, investigation, and analysis. These papers are not considered as being part of the contract documents; publication of this information does not imply any responsibility on the part of the U.S. Government. In no event may this information be made the basis for contract claim against the Government or used in furtherance of any such claim.

\*     \*     \*     \*     \*     \*

6. *Site conditions.*

\*     \*     \*     \*     \*     \*

(f) *Winds.* The entire area is subject to occasional cyclonic distrubances [sic] similar to the hurricanes of the Carribean. Winds up to 125 knots have been recorded at Onslow, approximately 60 air miles ENE of the project sites, and winds of approximately 100 miles per hour have been recorded at Vlaming Head Lighthouse. Forecast-

ing and weather prediction is less comprehensive than in the U.S.A. but some advance notice may be received locally.

(g) *Rainfall.* The Cape area receives an average rainfall of about 12 inches per year. The normal rainy season occurs during the months of April through July. Cyclonic distrubances [*sic*] are most frequent in January, February, and March. Rainfall may be concentrated in intense downpours.

(h) *Temperature.* The temperature range at the site is from the forties to approximately 115 degrees F. Due to the low incidence of fog and clouds, clear weather may be expected over large portions of the year, with extended periods of high daytime temperatures during the summer months. Weather records including temperature, humidity, and wind have been recorded at Vlaming Head Lighthouse for several years. These records are on file in the Commonwealth of Australia, Bureau of Meterology, Melbourne.

\* \* \* \* \* \*

No other weather data relevant to this suit was given to the bidders in the invitation.

Following the "suggestion" in subparagraph (h) of paragraph 6 of the Information for Bidders document, plaintiff, in addition to inspecting the site, examined the weather data recorded at Vlaming Head Lighthouse, located about 5 miles distant from Point Murat. From its examination of the records plaintiff determined that adverse sea conditions at Point Murat would be mostly generated by winds in quadrants from north through east to south and that winds from the remaining compass points would be land breezes which would not adversely affect the work.

Plaintiff also examined navigation charts of the general area which had been prepared by the Hydrographic Service of the Royal Australian Navy. These charts showed currents up to a maximum of 1.5 knots at a place in open water approximately 2 miles north of Point Murat. Plaintiff also decided that swells from the Indian Ocean would be dissipated by offshore islands and reefs. Plaintiff then assumed that unworkable seas would result from winds of force 5 (19–24 miles per hour), or greater, on the Beaufort Scale from north through east to south. Thus, plaintiff assumed that a floating plant, which would be necessary to construct the pier, could operate at Point Murat only when winds were less than 19 m. p. h. from north through east to south, and at any but very high velocities in the other quadrants. From the Vlaming Head Lighthouse records plaintiff calculated that the seas at Point Murat would be too rough for floating plant operation 17 percent of the time.

Plaintiff also made inquiries of the Harbour and Lights Department of Western Australia, the Freemantle Harbour Trust, and the North West Whaling Company. These inquiries, however, produced no information concerning prevailing weather and sea conditions at Point Murat.

Plaintiff learned of the existence of the Piggford and Drexel reports concerning the weather and sea conditions at Point Murat and, accordingly, approached the Department of Public Works of Western Australia and asked permission to examine their contents. The department flatly refused on the ground that the reports had been prepared solely for the United States Navy. Plaintiff then approached the Navy and asked permission to examine the reports. The resident officer in charge of construction refused to produce the reports with the remark that the Navy expected bidders to make their own site investigations. As a result, plaintiff submitted its bid with knowledge of the existence of the reports, but without knowledge of the extremely adverse weather and sea conditions existing at Point Murat as described in the reports.

In the performance of the contract plaintiff found the sea conditions at the site to be far worse than it had antici-

pated. The Piggford and Drexel reports proved to be quite accurate. At times the sea changed from calm to hazardous within minutes. As a result plaintiff alleges that work from its floating plant was feasible only about 40 percent of the time, rather than 83 percent as it had anticipated (17 percent "downtime").

Pursuant to the standard "Disputes" clause of the contract, plaintiff presented to the contracting officer a comprehensive pier claim involving numerous alleged changes, changed conditions, and excusable delays. One facet of this total claim was plaintiff's contention that the adverse sea conditions encountered at the site constituted changed conditions within the meaning of the standard "Changed Conditions" clause.[2] The contracting officer denied plaintiff's pier claim in its entirety and plaintiff duly appealed this decision to the ASBCA. Hardeman-Monier-Hutcherson, A Joint Venture, ASBCA No. 12392, 68-2 BCA ¶ 7220.

The board awarded plaintiff numerous extensions of time and monetary relief on various facets of plaintiff's total pier claim which are not involved in the present controversy. The board, however, denied plaintiff's claim that adverse sea conditions constituted changed conditions:

Weather no matter how severe does not, by itself, constitute a changed condition so as to entitle the contractor to relief under the Changed Conditions clause. S. S. Mullen, Inc., ASBCA No. 8583, 65-1 BCA ¶ 4644; E. W. Jackson Contracting Co., Inc., ASBCA No. 7267, 1962 BCA ¶ 3325; Keflavik Contractors, ASBCA No. 6387, 61-2 BCA ¶ 3161; Koeneke and Latimer, ASBCA No. 3163, 57-1 BCA ¶ 1313; Arundel Corporation v. United States, [3 CCF 605] 103 Ct.Cl. 688 (1945), cert. den. 326 U.S. 752 [66 S.Ct. 90, 90 L.Ed. 451]; The Government Contractor, Briefing Paper No. 65-4, August 1965. Such natural occurrences as tidal currents and ocean swells would fall within this rule. The sea conditions at Point Murat resulted from wind, swells, and tides.

The Changed Conditions article is a warranty against Government misrepresentation of "subsurface or latent physical conditions at the site differing materially from those indicated in this contract." Since there were no affirmative representations of wind, tidal currents, or other sea conditions in the contract, or in the pre-bid documents, there could be no changed condition under this part of the clause. There remains for consideration whether the respondent's refusal to disclose the reports of adverse sea conditions from the Department of Public Works permits recovery under the second part of the Changed Conditions article. The appellant may recover if it encountered "unknown physical conditions, * * *, of an unusual nature, differing materially from those ordinarily encountered and generally

---

2. The Changed Conditions clause provides:
"The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (a) *subsurface or latent physical conditions at the site differing materially from those indicated in this contract,* or (b) *unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.* The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; or unless the Contracting Officer grants a further period of time before the date of final payment under the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 of these General Provisions." [Emphasis supplied.]

recognized as inhering in work of the character provided for in this contract." Rough seas, created by wind and tide, cannot be considered to be of an unusual nature or not ordinarily encountered in working from floating plant in open water. This is not altered by the fact that the respondent had some knowledge of normal sea conditions at Point Murat which it did not disclose to the appellant. [68–2 BCA at 33520.]

Although the board denied plaintiff's claim that the adverse sea conditions constituted changed conditions, it did find that the Vlaming Head records misled plaintiff:

> The invitation for bids contained no affirmative representation as to winds, tide, currents, or sea conditions, other than the statement that there were occasional cyclones, and that weather records had been recorded at Vlaming Head Lighthouse for several years. The limited bidding period did not permit the appellant to make its own site observations of the weather and the sea. The Vlaming Head weather records were misleading, in that they indicated about ⅓ more days when sea conditions would have permitted work than when such conditions actually prevailed at Point Murat. The respondent had in its possession information of the strong prevailing winds and rough seas during the June, July and August winter season, when weather conditions at North West Cape should have been at their best. The captains of the Gunga Din had not only recorded their difficulties during this period, but the report of the Department

of Public Works, Western Australia, had specifically noted the difficulties of work from floating plant at the Point Murat site. The respondent not only failed to publish these reports to bidders, but refused to permit the appellant to examine them when it requested permission to do so. Of course, the Board recognizes that these observations were not extensive enough to establish a general year-around wind and sea pattern at Point Murat. The reports did, however, show the same adverse conditions during two successive winter seasons, and contained the only recorded information on the strong tidal currents at the pier site More important, we think these reports would have offered the appellant an opportunity to study the applicability of the Vlaming Head weather records to the wind conditions at Point Murat.

> The appellant misjudged its ability to work in rough seas. This was probably due to the fact that it was not able to secure adequate floating plant to work under such conditions. The appellant must bear the consequences of its misjudgment, and this was considered by the Board in reaching the finding that the pier was delayed 150 days by unanticipated unworkable sea conditions, rather than 212 [220] days as requested by the appellant. [68–2 BCA at 33519–20.]

Further, the board held that the Navy should have disclosed the Piggford and Drexel reports to the contractor and this constituted an act of the Government within the meaning of the "Termination for Default" clause[3] of the contract.

---

3. The Termination for Default clause, as modified, provides in pertinent part as follows:

"(d) The Contractor's right to proceed shall not be so terminated nor the Contractor charged with resulting damage if:

"(1) The delay in the completion of the work arises from causes other than normal weather beyond the control and without the fault or negligence of the Contractor, including but not restricted to, acts of God, acts of the public enemy, *acts of the*

*Government* in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, or delays of subcontractors or suppliers arising from causes other than normal weather beyond the control and without the fault or negligence of both the Contractor and such subcontractors or suppliers; and" [Emphasis supplied.]

This resulted in the board finding that plaintiff could not be assessed for liquidated damages for that portion of the unworkable sea conditions that were reasonably unanticipated by plaintiff. As indicated above, the board found this to be 150 days out of the 220 days which were requested by plaintiff:

The Default article of the contract provides that the contractor may not be assessed with liquidated damages for delays from causes beyond the control and without his fault or negligence. It lists a number of such excusable causes, among them, "Acts of the Government." The contract clause makes no distinction between rightful or wrongful acts, except that they must not be brought about by the appellant's control, fault, or negligence. In this case the Government's agents knew of prevailing adverse weather conditions at the site for at least a part of the year, and knew that the appellant did not have this information. It should have disclosed this data, but instead, refused to do so when it was requested by the appellant. We think this to be such an "act of the Government" as to prohibit the imposition of liquidated damages for that portion of the unworkable sea conditions as the appellant did not and should not have anticipated. Midvale-Heppenstall Co., ASBCA No. 7525, 65–1 BCA ¶ 4629. The time for usable completion of the pier should be extended 150 calendar days. [68–2 BCA at 33520.]

Plaintiff has moved for summary judgment on alternative grounds alleging (1) that the Government's failure to disclose data in its possession concerning the weather and sea conditions at the site constituted a breach of contract and (2) that the ASBCA erred as a matter of law in holding that the sea conditions encountered by the contractor at the site were not changed conditions.

Defendant opposes plaintiff's motion by way of a cross-motion for summary judgment and a counterclaim for the 150 days of liquidated damages which the ASBCA held could not properly be assessed against plaintiff.

I

█ Plaintiff contended before the ASBCA that it was entitled to an equitable adjustment under the Changed Conditions clause for the delays it encountered as a result of the unanticipated adverse sea conditions existing at the site. As noted previously, the board denied relief on this claim holding that sea conditions did not constitute changed conditions. The board was clearly correct in ruling that there could be no changed condition premised under part (a) of the clause[4] since it is uncontroverted that there were no affirmative representations of sea conditions in the contract. Pacific Alaska Contractors, Inc. v. United States, 436 F.2d 461, 193 Ct.Cl. 850 (1971); S. T. G. Constr. Co., Inc. v. United States, 157 Ct.Cl. 409 (1962). Recognizing this, plaintiff has premised its claim under part (b) of the clause.[5]

Plaintiff argues that the adverse sea conditions it encountered were unusual and differed materially from those sea conditions ordinarily encountered and generally recognized as inhering to the construction of pier facilities. The weather cases relied upon by the board are distinguished by plaintiff on the ground that they all involved sudden and intermittent weather occurrences, as opposed to prevailing abnormal conditions. Plaintiff does not contend that weather occurrences constitute changed conditions. Rather, it is plaintiff's contention that unforeseeable and abnormally adverse prevailing sea conditions constitute changed conditions.

Defendant, in arguing that the board's decision with respect to this issue is correct, asserts that the sea conditions

---

4. The Changed Conditions clause is reproduced in its entirety, *supra* note 2.

5. *Id.*

were simply not unusual for this type of work and were in fact normal conditions for this area. Defendant further relies on the general rule, supported by the cases, that weather is not a risk which is shifted to the Government via the Changed Conditions clause. *See, e. g.,* Tombigbee Constructors v. United States, 420 F.2d 1037, 190 Ct.Cl. 615 (1970); Security Nat'l Bank of Kansas City, Kansas City, Kan. v. United States, 397 F.2d 984, 184 Ct.Cl. 741 (1968); Banks Constr. Co. v. United States, 364 F.2d 357, 176 Ct.Cl. 1302 (1966); Lenry, Inc. v. United States, 297 F.2d 550, 156 Ct.Cl. 46 (1962).

The court holds that the board was correct. We feel compelled to affirm the board because the facts before us demonstrate that the wind and other weather conditions were so intertwined with the conditions of the sea that it is difficult, if indeed not impossible, for us to separate the sea conditions from the weather. Also, it appears to the court that the weather was probably the dominant factor which actually determined the nature of the sea conditions at the site.

Notwithstanding that the court endorses the board's ruling on this issue, we do not wish to intimate that we believe that adverse sea conditions could *never* constitute changed conditions within the meaning of the standard Changed Conditions clause.

## II

Having disposed of the changed condition issue we now turn to plaintiff's alternative ground for relief bottomed on a theory of breach of contract and to defendant's counterclaim. Plaintiff contends that the Navy's refusal to disclose data in its possession concerning weather and sea conditions at the site constituted a breach of contract, as a matter of law, on the basis of the record and findings of the ASBCA. Plaintiff specifically relies on the board's ruling that the Navy should have disclosed the Piggford and Drexel reports to the contractor. This refusal on the part of the

Government, according to the board, constituted an act of the Government within the meaning of the Termination for Default clause, thereby prohibiting the imposition of liquidated damages for a period of 150 days. Plaintiff also relies on the board's finding that the Vlaming Head records concerning weather and sea conditions were misleading to the extent that they indicated about one-third more days would have been workable than were actually experienced at Point Murat.

Whether or not factual findings and conclusions are supported by substantial evidence goes to the reasonableness of what the board did on the basis of the evidence before it. United States v. Carlo Bianchi & Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). In applying this standard to the present case, the court has reviewed the administrative record and, upon consideration of the parties' briefs and oral argument, we have reached the conclusion that the board's findings are reasonable and therefore supported by substantial evidence. We also hold that the board's ruling that the failure to disclose the reports constituted an act of the Government within the meaning of the Termination for Default clause is correct as a matter of law. Defendant cannot, therefore, prevail on its counterclaim. Furthermore, since the findings of the board were not gratuitous, but instead were properly made in the resolution of disputes under the contract, defendant is estopped from contesting these findings in the present breach of contract proceeding. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 419–422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Air-A-Plane Corp. v. United States, 408 F.2d 1030, 1036–1037, 187 Ct.Cl. 269, 281–282 (1969). Thus, the issue before us narrows to whether the record and decision of the board establish a breach of contract as a matter of law. We think that it does.

It is well settled in this court that where the Government possesses special knowledge, not shared by the con-

tractor, which is vital to the performance of the contract, the Government has an affirmative duty to disclose such knowledge. It cannot remain silent with impunity. Helene Curtis Indus., Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963). *See also, e. g.*, Aerodex, Inc. v. United States, 417 F.2d 1361, 189 Ct.Cl. 344 (1969); J. A. Jones Constr. Co. v. United States, 390 F.2d 886, 182 Ct.Cl. 615 (1968).

In the instant case it is apparent that (1) the Piggford and Drexel reports which were possessed by the Government contained vital information concerning the weather and sea conditions at the site; (2) the weather and sea conditions were of paramount importance in the performance of the contract; (3) the Government deliberately chose not to reveal the information contained in the reports to the contractor—even when expressly requested to do so by the contractor; (4) the contractor bid with knowledge of the existence of the reports, but without knowledge of their contents; and (5) the contractor encountered adverse weather and sea conditions which were not reasonably foreseeable, thereby resulting in lengthy delays in the performance of the contract.

■ Under these circumstances the board reached the conclusion that the Government should have disclosed the contents of the reports to the contractor. We agree. There was no justifiable or excusable reason for the Government's refusal to disclose this vital knowledge to the contractor. The court holds that, as a matter of law, the defendant had a duty to disclose and share its superior knowledge and the failure to discharge this duty constituted a breach of contract. Helene Curtis Indus., Inc. v. United States, *supra.*

Defendant has called our attention to the fact that, in the prior cases in which we have held the Government had a duty to disclose certain information or knowledge, the contractor was unaware of the existence of such information. This distinction, submits defendant, establishes that there was no breach of contract in the present case. Defendant's rationale

in support of this contention is that, since the contractor knew of the existence of the reports and was refused access thereto, it should have assumed that their contents were adverse. In short, plaintiff assumed the risk and therefore defendant had no duty to disclose. We reject this argument. In our view it is patently unreasonable to say that the duty to disclose has been discharged, or that such a duty did not arise, simply because the contractor knew of the mere existence of the reports. The court fails to see how this fact, without more, renders the Government any less culpable.

■ Defendant has also argued that, even if the court finds a breach of contract, recovery by plaintiff on such a theory is barred by the terms of a release agreed to by plaintiff. Following the decision of the ASBCA, and prior to suit in this court, the parties executed a release agreement in settlement of all outstanding claims except those expressly reserved by plaintiff. The pertinent provision of the exclusionary language of the release provides:

> * * * except: (1) Contractor's claim for extra costs incurred in construction of the pier because of adverse sea conditions disallowed by the Armed Services Board of Contract Appeals in ASBCA No. 12392 and intended to be appealed by the contractor to the U.S. Court of Claims; * *

Defendant argues that the modifying phrase "disallowed by the Armed Services Board of Contract Appeals" is controlling in interpreting the scope of the reservation. That is, since the board had no jurisdiction over breach of contract claims, plaintiff only reserved its changed condition claim, as that was all that could be properly disallowed by the board. We disagree with defendant's interpretation. A fair reading of the language, quoted above, coupled with what the court believes to be the intent of the parties, indicates that plaintiff's breach of contract claim was also excepted from the release. Looking to the language in its entirety, the thrust of the exception is to reserve plaintiff's

*claim for extra costs* which resulted from adverse sea conditions and not, as defendant contends, to reserve only plaintiff's claim for such relief under the contract. Therefore, the release does not bar plaintiff's recovery for breach of the contract.

## CONCLUSION

The court thus holds that plaintiff is not entitled to relief based upon the Changed Conditions clause; however, it is entitled to recover based upon its alternative ground for relief for breach of contract. Liability having been established, the sole issue to be resolved at trial is the amount of damages.

Accordingly, with respect to plaintiff's claim for relief under the contract, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted.

With respect to plaintiff's claim for relief based upon breach of contract, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. Defendant's counterclaim is also dismissed. The case is remanded to the trial commissioner for further proceedings consistent with this opinion pursuant to Rule 131(c) (2).