ORDER AND REASONS

BERRIGAN, District Judge.
This matter comes before the Court on motion for summary judgment filed by the defendant, United States of America (“United States”). Having considered the record, the memoranda of counsel and the law, the Court has determined that summary judgment is appropriate for the following reasons.
The undisputed facts show that in 1987, the plaintiff, TANO Automation, Inc. (“TANO”), entered into a contract with the Coast Guard to design, produce, test and install a computer system for two Coast Guard polar icebreakers. After beginning work on the contract, TANO suspected error in the Government-Furnished Information (“GFI”) supplied by the Coast Guard. In April 1989, TANO submitted a Rough Order of Magnitude (“ROM”) setting forth an estimate of the resulting additional costs. Negotiations between TANO and the Coast Guard began at that time. TANO resubmitted the ROM as a Request for Equitable Adjustment (“REA”), which was subsequently revised by letters, the last of which was dated September 19, 1989. On October 1, 1989, the Coast Guard accepted the settlement counter-offer made by TANO. In January 1990, the parties made the “Supplemental Agreement of Settlement and Release of Liability” part of their contract by signing a bilateral modification (“Modification 20”).
*485 TANO maintains that the settlement concerned only additional costs and performance delays caused by defective GFI in the design phase of the contract. In this suit, TANO seeks recovery of subsequent additional costs it allegedly incurred because of defective GFI. It also claims that the Coast Guard knew its GFI was defective even before accepting bids for the project, that the Coast Guard had concealed the fact that its GFI were grossly defective from bidders and that the defectiveness of the GFI was also concealed from TANO in negotiations leading to the settlement agreement.
TANO is suing the United States for the additional monies allegedly owed under the contract and argues that the settlement is void because of mutual mistake and fraud. In this motion, the United States argues first that TANO’s claims are barred because of the settlement. It further claims that the TANO cannot prove fraud as a matter of law and that TANO has otherwise ratified the settlement.
SETTLEMENT
The language in the settlement document entitled “Supplemental Agreement of Settlement and Release of Liability” provides in pertinent part:
WHEREAS, the Contractor has submitted, by letters dated 12 April 1989, 25 May 1989, 6 June 1989 and 29 August 1989, a Request for Equitable Adjustment in the amount of $1,712,922.46 which includes allegations of defective Specifications and Government Furnished Information provided as a part of this contract ...
* * 4* * * 4*
WHEREAS, The Government and the Contractor desire now to settle these issues under the Contract;
NOW, THEREFORE, in consideration of the foregoing, the parties do mutually agree as follows:
******
ARTICLE 2 — THE REQUEST FOR EQUITABLE ADJUSTMENT
This Supplemental Agreement constitutes full and final compensation for all costs, including costs of travel and inspection aboard the cutters such as discussed in the Contractor’s letter 4910-1681-165 dated 20 September 1989, associated with the Contractor’s Request for Equitable Adjustment as described in the following letters:
* Serial 4910-1681-07 dated 14 September 1988;
* Unserialized letter dated 12 April 1989;
* Serial 4910-1681-139 dated 25 May 1989;
* Serial 4910-1681-142 dated ' 6 June 1989; and
* Serial 4910-1681-156 dated 29 August 1989.
******
ARTICLE 16 — FULL AND FINAL SETTLEMENT
(a) The Contractor ... hereby remises, releases, and forever discharges the Government ... from (i) any and all actual or potential entitlement of the Contractor to any equitable adjustment in the Contract price or delivery schedule, or both, of this contract for Covered Events or for the impact of Covered Events; and (ii) any and all actual or potential liabilities to the contractor for money damages and/or other relief for Covered Events or for the impact of Covered Events upon this contract.
******
(2) “Covered Events” refers to events occurring before the effective date of this Supplemental Agreement, whether formal or constructive, which were known or rea- ■ sonably should have been known to the Contractor as of the effective date of this Supplemental Agreement.
(d)(1) The Contractor hereby confirms and acknowledges that in agreeing to the terms of this Supplemental Agreement, it has considered, made full allowance for, and is releasing all rights to any entitlement for any and all costs under, and any and all impacts upon, this Contract, whether or not such costs and impacts are known or unknown or foreseeable or unforeseeable as of the effective date of this Supplemental Agreement, whether or not *486 such costs and impacts have been discussed with, or for any reason reserved for future discussion with, the Government, or have been made the basis for other assertions of claims or request for equitable adjustment, whether or not such costs and impacts were, or are, incurred and sustained, respectively, before or after the effective date of this Supplemental Agreement, and whether or not such costs and impacts are caused directly by, indirectly by, cumulatively by, or in consequence of the impact of any of the Covered Events. * * * * * *
(d) The Contractor’s release is complete and final, no rights are reserved under this Supplemental Agreement, and in any event, any and all such rights shall be deemed to have been waived without exception.
(Rec.Doc. 23, Exh. C).
TANO does not take issue with any specific word or words in the release. Neither does TANO controvert the “one critical and undisputed fact” asserted by the United States that only one set of GFI exists; that was delivered to TANO prior to 1989 and forms the basis of its settled claims. (Rec. Doe. 23, p. 2) (emphasis original). Rather, TANO argues that it may introduce extrinsic evidence to prove intent without first establishing an ambiguity in the release and that the United States may not rely on the release if the United States is guilty of passive fraud or bad faith.
TANO’s argument for the consideration of extrinsic evidence relies heavily on United States v. Lennox Metal Manufacturing Co., 225 F.2d 302 (2d Cir.1955), which focused on the word “may” in a contract drafted by the government. However, that court clearly did find ambiguity in the word “may” before discussing and criticizing the requirement that an ambiguity be shown before extrinsic evidence is considered: “We think that, in its context, ‘may’ sufficiently lacks clarity to satisfy the ‘ambiguity’ test, that its meaning is ‘not so clear as to be self-evident,’ that it was ‘capable of being understood in more senses than one.’ ” Lennox, 225 F.2d at 309 (footnotes omitted). In addition, the court noted the following with regard to jurisprudence allowing extrinsic evidence:
These rulings deserve peculiar emphasis when, as here, one of the parties drafted the contract, couching it in complicated terms set forth in crowded print; for then the court should follow the contra profer-entum rule, i.e., should adopt that interpretation, the legal effect of which bears most strongly against the one who chose the words. And where, as here, the government official in charge has given the other party an interpretation of the “verbose and complicated Government writings,” that party may properly rely upon that interpretation.
Lennox, 225 F.2d at 315. Here, of course, the uncontroverted proof indicates that TANO was represented by counsel at all times throughout the negotiations and settlement. It is also undisputed that TANO’s own counsel offered the language used in the release. TANO’s response to this latter fact emphasizes that the original source of the language was the government in a different, previously-settled case handled by the firm representing TANO in these negotiations. While this fact may reflect upon the experience and expertise TANO enjoyed in its legal representation, it offers no relevant distinction that would relieve TANO of the fact that this language, even if ambiguous, would be interpreted against it as drafter.
Neither party provides a meaningful choice of law discussion with regard to the law applicable to the interpretation of the release and the admissibility of parol evidence. The Court is comfortable with the rules that “[n]ormally the release of federal claims is governed by federal law,”[1] and “[p]ublic policy favors voluntary settlement of claims and enforcement of releases.” Williams v. Phillips Petroleum Co., 23 F.3d 930, 935 (5th Cir.1994), cert. denied, — U.S. -, 115 S.Ct. 582, 130 L.Ed.2d 497 (1994). Accord: Ingram Corp. v. J. Ray McDermott *487 & Co., Inc., 698 F.2d 1295 (5th Cir.1988). The Court unhesitantly accepts the federal view that:
Once a party establishes that his opponent signed a release that addresses the claims at issue, received adequate consideration, and breached the release, the opponent has the burden of demonstrating that the release was invalid because of fraud, duress, material mistake, or some other defense. We examine the totality of circumstances to determine whether the releasor has established an appropriate defense.
Williams, 28 F.3d at 935.
The Court finds much guidance in Ingram, which dealt with sophisticated commercial parties represented by counsel throughout the negotiations leading to the settlement:
A court is entitled to take words spoken so clearly in their ordinary and plain sense. “Unmistakably clear” language which is contained in releases negotiated by commercial parties with substantially equal bargaining power should be construed to mean what is says. It does not matter that Ingram may not have known of or articulately considered all the possible claims it was relinquishing against McDermott ... These factors alone do not require a court, absent very exceptional circumstances, to vitiate otherwise valid releases. This is especially true when the party asserting the invalidity of the releases has made insufficient factual allegations to show that the releases were procured by accident, mutual mistake, fraud, duress, or any other tactic that overbore and distorted his will which may have caused him to act in a way other than sound business judgment would have ordinarily decided.
Thus, Ingram cannot escape the validity of the releases by merely asserting ignorance of its antitrust claim. Indeed, it may be unaware of many claims existing in its favor. When a release provides that “any and all claims,” “past, present, or future” are to be extinguished, a court is required to enforce its provisions both as to known and unknown claims. A contrary result would not contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation.
In this case, we are buttressed in our decision by the omnipresence of high level executives and competent counsel throughout the entire business activities. The settlement of the many controversies between these parties was no fly-by-night transaction. After months of wrangling and negotiation the executives of Ingram and McDermott exchanged letters outlining proposed settlement terms ... This was followed by the formal releases which were drafted by the parties through their skilled and knowledgeable counsel.
Ingram, 698 F.2d at 1312.
The Court finds that the language contained in the “Supplemental Agreement of Settlement and Release of Liability” to be absolutely clear and unambiguous in its release of any and all claims, including those claims at issue in this lawsuit. “The parol evidence rule ... prevents the court from considering evidence of prior dealings, on a motion for summary judgment or otherwise, when put forth for the purpose of varying the meaning of clear, unambiguous language.” King Fisher Marine Service, Inc. v. United States, 16 Cl.Ct. 231, 234 (Ct.Cl.1989). “Furthermore, parol evidence may not be utilized by a party in order to create an ambiguity.” Id.
In addition, within the realm of the government contract, the courts have announced specific rules of interpretation that bear on the issues presented with the release. “Since the information regarding any unresolved claims against the government lies with the contractor, common sense indicates that placing the burden on the contractor to identify and specify such claims clearly in the release is proper.” Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1394 (Fed.Cir.1987). “Exceptions to releases are strictly construed against the contractor.” Id. Here, no claims were reserved in the release by TAÑO and all rights were specifically “waived without exception.” (Rec.Doc. 23, Exh. C).
*488 The Court concludes that the release is clear and unambiguous and covers all claims derived from allegedly defective GFI. As such, parol evidence will not be considered.
FRAUD
TANO’s next attack on the Release language is the claim that “the Coast Guard knowingly and in bad faith concealed its true intent to use the release language in Mod 20 to foreclose any further claims, despite TANO’s contrary intention to retain its right to assert future costs in the production and installation phases.” (Rec.Doc. 25, p. 17). Specifically, TANO claims that the Coast Guard concealed the fact that the GFI was defective and inadequate throughout the performance of the contract and during settlement negotiations.
This claim that alleged Coast Guard fraud and bad faith serves to vitiate the release is also short-lived. TANO relies on Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364 (Ct.Cl.1972), a casé in which the government was found in breach of contract and liable for extra costs because it did not disclose adverse weather conditions relevant to the contract work. It also cites Michael Rose Productions v. Loew’s Inc., 143 F.Supp. 606 (S.D.N.Y.1956) for the proposition that passive fraud can annul a release.
Fraudulent inducement can vitiate a release. Ingram, swpra. “Parties bargaining at arms length who are not in a fiduciary relationship with one another are not required to make known all possible claims against one another.” Ingram, 698 F.2d at 1315. “[S]ilence as to possible ... claims is not the same thing as fraudulent inducement.” Id.
Here, the language of the release itself belies the allegation of fraud. Again, only one set of allegedly defective GFI was ever provided to TANO. TANO was fully represented by counsel who proposed the language to which it now objects:
(d)(1) The Contractor hereby confirms and acknowledges that in agreeing to the terms of this Supplemental Agreement, it has considered, made full allowance for, and is releasing all rights to any entitlement for any and all costs under, and any and all impacts upon, this Contract, whether or not such costs and impacts are known or unknown or foreseeable or unforeseeable as of the effective date of this Supplemental Agreement, whether or not such costs and impacts have been discussed with, or for any reason reserved for future discussion with, the Government, or have been made the basis for other assertions of claims or request for equitable adjustment, whether or not such costs and impacts were, or are, incurred and sustained, respectively, before or after the effective date of this Supplemental Agreement, and whether or not such costs and impacts are caused directly by, indirectly by, cumulatively by, or in consequence of the impact of any of the Covered Events. * # * * * *
(d) The Contractor’s release is complete and final, no rights are reserved under this Supplemental Agreement, and in any event, any and all such rights shall be deemed to have been waived without exception.
(Rec.Doc. 23, Exh. C). This language is comprehensive and clear. All claims for costs and impacts arising out of allegedly defective GFI were recognized and forever barred according to TANO’s own language.
It should be noted that TANO does not claim affirmative misrepresentation other than the Coast Guard’s refusal to admit that the GFI was defective. TANO does not discuss and this Court cannot ignore the undisputed fact presented by the United States: in June 1989, TANO’s president wrote the contracting officer of the Coast Guard on June 16, 1989, in the midst of the negotiations that lead to the settlement. In an effort to urge the Coast Guard to adopt TANO’s proposed bilateral modification, TANO’s president quoted caselaw and stated:
The Coast Guard knows that its GFI and specifications are defective; the Coast Guard knows that the defective GFI and specifications significantly disrupted and delayed TANO’s performance, causing TANO to lose important time off the schedule, despite its efforts to accelerate; *489 and the Coast Guard now has adequate information and data to fully support a provisional payment. Under these circumstances, your refusal to grant the relief requested clearly cannot be described as “well-intentioned.”
(Rec.Doe. 28, Exh. E). Given the undisputed fact that only one set of allegedly defective GFI is at issue, TANO has failed to rebut the equally undisputed fact that any claimed concealment of defectiveness by the Coast Guard was woefully unsuccessful. In fact, TANO received significant monies in response to its allegations of defectiveness when settlement was reached, which reflects recognition of the invalidity of the GFI by the Coast Guard.
Essentially, TANO is arguing that any reservation or denial of liability by a party to a written release can serve to void the settlement in the event that subsequent proof serves to establish liability. This is a radical statement of the law that finds no legal support in the caselaw and no equitable support in these undisputed facts. This Court is unable and unwilling to be the first to endorse such a rule that could be used so freely to undermine the finality of any release not based on a specific finding of fault.
Accordingly,
IT IS ORDERED that the motion for summary judgment filed by the United States of America is hereby GRANTED. Judgment shall be entered in favor of the defendant and against the plaintiff.

. The Court is also confident that an analysis of the issues relating to validity of the release and the admissibility of parol evidence would bear the same results if Louisiana law applied. Ingram, supra.