**AERODEX, INC.**
v.
**The UNITED STATES.**
**No. 346–64.**

United States Court of Claims.
Nov. 14, 1969.

J. Philip Smith, Washington, D. C., for plaintiff. Robert V. Smith, Washington, D. C., attorney of record. Smith, Ristig & Smith, Washington, D. C., of counsel.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM.

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to prepare and file with the Clerk his opinion and recommendation for conclusions of law on the issues, under the order of reference and Rule 99(c) [since September 1, 1969, Rule 166(c)]. The commissioner has done so in an opinion and report filed on October 15, 1968. On February 18, 1969, defendant filed a request for review asking that the court reject the commissioner's opinion and recommendation. Plaintiff requested that the court adopt the commissioner's report in its entirety. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion and recommendation

of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff's motion for summary judgment is granted and defendant's cross-motion denied to the extent set forth in the commissioner's opinion. Judgment is entered for plaintiff on the issue of liability with proceedings here to be suspended for six (6) months, to afford plaintiff an opportunity to obtain determination of the amount of the equitable adjustment through further Board proceedings, pursuant to Rule 167.

Commissioner Bernhardt's opinion, as modified by the court, is as follows:

This application for review of an Armed Services Board of Contract Appeals decision (Appeal of Aerodex, Inc., ASBCA No. 7121, 1962 BCA ¶ 3492 and, on reconsideration, 1964 BCA ¶ 4057) originated in the delay-producing inability of the Government to furnish plaintiff a source of supply or the material specifications for a vital component of a thermistor mount under a bid procurement for a quantity of the latter, and the refusal of the Western Electric Company, as holder of a previous comprehensive research and development contract which included the thermistor mount, either to divulge for plaintiff's use the material specfications for the said component in which Western Electric ostensibly claimed proprietary rights, or to sell the component to plaintiff to permit completion of the contract. A second claim relates to delays resulting from the alleged failure of the Government to provide adequate testing data.

The plaintiff's claim was advanced to the Board under the Changes clause of the contract. It is presented here in alternative counts reading in (1) review of the Board decision under the substantial evidence standards of the Wunderlich Act (41 U.S.C. § 321), (2) breach of contract in that the Government failed to list in its purchase description for the troublesome component a commercially available item, or to give plaintiff the material specifications for the compo-

nent, or to furnish plaintiff necessary testing data, and (3) breach of warranty with respect to the matters complained of as breaches of contract in count 2. Despite the fact that the contracting officer had rejected the claim initially on the grounds of lack of timeliness under the Changes clause, and did not address the merits, the Board entertained and disposed of the claim on its merits and rejected the timeliness defense. The court has heretofore refused plaintiff's request to consider *de novo* evidence, and the rights of the parties now rest on the contents of the Board record which has been lodged with the court for purposes of review on cross-motions for summary judgment filed pursuant to former Rule 96. We disagree with the Board.

The factual basis of plaintiff's claims is in two parts, viz:

## PART I

### *Nonavailability of component*

On June 14, 1958, plaintiff was awarded a bid contract to supply 233 probe thermistor mounts by the United States Army Ordnance Missile Command at Redstone Arsenal for $61.94 each with delivery in installments from 180 to 240 days after the award. The thermistor mount is a device used to measure radio frequency energy being transmitted by wave guides in the Nike-Hercules missile system. The electronic nerve center of the thermistor mount is a matched pair of thermal resistors.

Two drawings accompanying the invitation specified that the matched sets of thermal resistors were to be Western Electric Company's Part No. GA51387, Items 1B and 2B, respectively, "or approved substantial equal". The thermal resistor drawings had been prepared by Bell Telephone Laboratories, Inc., a

Western Electric affiliate. The resistors had been manufactured and used by Western Electric in 1956 (and presumably earlier) under a research and development contract which the latter company had been awarded for the comprehensive Nike-Hercules missile system,[1] of which the thermistor mount was a relatively small part. The record refers to the thermal resistors as the proprietary item of Western Electric, which we take to mean that Western Electric claims that it was developed at the expense of Western Electric as opposed to being a reimbursed product of its research and development contract.

The matched thermal resistors were the only components of the 35 elements comprising the thermistor mount whose material contents were not described in the contract in suit. Instead, their dimensions and performance requirements were given. Thermal resistors *per se* are generically a rather common item in the modern electronic industry and consist essentially of electronic beading made of varying materials, to which filaments are attached. Based upon its broad experience with Government contracts, including some involving more complex components of missile systems, the plaintiff expected to obtain the material specifications for the thermal resistors from the Government and to manufacture them "in-house" at a cost of about $1.43 each, rather than purchase them ready-made. During the bid period it made no inquiries either about their availability from Western Electric or other suppliers, or about the availability of material specifications from the Government.

On or about October 20, 1958, when plaintiff had reached a stage of performance where thermal resistors would be

---

1.  Bell Telephone Laboratories, Inc., actually developed the missile system under a research and development contract, while Western Electric designed the production system under a companion research and development contract for engineering services. Bell Telephone Laboratories, Inc., is the research and development subsid- iary of American Telephone and Telegraph Company, while Western Electric is the latter's hardware manufacturer, loosely speaking. The record is not precise as to these relationships and contracts, but variances in this respect are immaterial to this case.

needed, it discovered upon inquiry not only that the Government lacked—and could not obtain from Western Electric—the material specifications, but also that Western Electric refused to sell the resistors separately.[2] A number of other potential suppliers suggested by the Government were ascertained to be unable to provide resistors of the required performance characteristics. Western Electric offered to accept a subcontract for the entire thermistor mount at a quoted price of $310.41 each, with delivery in not less than 34 weeks, as contrasted with plaintiff's contract price of $61.94 and delivery in 180 to 240 days.[3] We are not advised whether Western Electric was an unsuccessful bidder against plaintiff for the contract in suit and, if so, what its bid might have been in contrast to plaintiff's or in contrast to the subcontract price it proffered to plaintiff. The resistors were listed in Western Electric's catalog as though they were available for public purchase, which was not the case in this instance.

The efforts of plaintiff to obtain from the Government either the material specifications for the thermal resistors, or a source of supply, and the Government's efforts to locate a source of supply and to obtain the material specifications from Western Electric, extended over a period of five months and involved extensive inquiries, to no avail. At one point the Government informed plaintiff that the "only acceptable Thermistor for supplies on your contract is the Western Electric Thermistor GA51387", although subsequent events demonstrated the Government's willingness to accept an "approved substantial equal" if one were found.

Faced with an apparent impasse and recognizing the plaintiff's lack of fault, on March 25, 1959, the Government advised plaintiff that it planned to terminate the contract for convenience of the Government, and asked that plaintiff furnish its estimate of termination costs for payment. A few days later the plaintiff, at the Government's suggestion, found that U.S. Dynapower Electronics, a recently organized company not in existence at the time plaintiff's contract was awarded,[4] was willing and able to furnish plaintiff suitable resistors at a price of $11.89 per matched set, with delivery in three to four weeks. The Government conditioned its approval of the substitute thermal resistors on the obtaining of a certification from U.S. Dynapower that its resistor would meet the requirements of the specifications. On May 25, 1959, plaintiff informed the Government that U.S. Dynapower had advised it by telegram that its resistor "meets all temperature resistance and physical requirements of Ordnance Drawing C–8520186", which it proved to do except for a minor design modification which was soon effected. After some further delay not clearly the fault of either party, on June 17, 1959, the Government authorized the "substitution" of the U.S. Dynapower resistor, and the plaintiff proceeded to place its order following the execution on June 26, 1959, of Modification No. 2 to the contract whereby plaintiff's delivery schedule was extended and plaintiff reserved its claim for an equitable adjust-

2. Whether this unwillingness had any relation to the consent decree entered against Western Electric and its parent company A.T.&T. for antitrust purposes is not known. The consent decree was entered on January 24, 1956, in United States v. Western Electric Company, Inc., et al., Civil Action No. 17–49, in the United States District Court for the District of New Jersey, and is reported at 1956 Trade Cases ¶ 68,246.

3. The Government advocates untenably that plaintiff should have accepted this offer in order not to default the contract, regardless of disproportionate cost. To avert a loss by contracting a greater loss is as bizarre as houseburning for termite eradication, an effective but impracticable remedy.

4. It was incorporated on August 11, 1958, and dissolved on December 22, 1961, a life span in rough correspondence with the plaintiff's need for the particular variety of thermal resistor.

ment based upon the Government's failure to supply material specifications for the resistors. The supply of U.S. Dynapower resistors permitted plaintiff to complete a few models for testing in October 1959, and eventually the total contract requirements.

The source of U.S. Dynapower's knowledge of the material specifications of the resistor it supplied is not explained in the record. Nor do we know whether or how the Government could ascertain the similarity in physical composition or performance characteristics between the Western Electric and the U.S. Dynapower resistors sufficient to determine the latter to be an acceptable substitute, much less a "substantial equal".

■ There is no dispute in the basic facts related above, which are reflected as well in the Board opinion. The principal basis of the Board's rejection of the claim was that the Government had no duty to supply the material content of parts specified by purchase description. A subsidiary basis was the plaintiff's failure to inquire in advance. Since the rejection rests on a question of legal duty rather than of disputed fact no finality attaches to it under the terms of the Wunderlich Act, *supra*.

The relevant drawing specifies that the plaintiff provide a particular thermal resistor made by Western Electric, "or approved substantial equal". Paragraph (E) of the continuation sheet of the contract provides:

*Definition of Term "or equal":* References herein to manufacturers' brand names and numbers are intended to be descriptive, but not restrictive, and are for the sole purpose of specifying the essential requirements. Bids on similar products, at least of equal quality and performance will be considered provided the products offered meet the actual needs and are *otherwise suitable for the intended* use. In the absence of any qualifying statements, it will be understood that the bidder is offering a product equal

to the brand name and number specified.

Section 2–201(d) of the relevant ASPR's (1955 ed., revised February 5, 1958) provides that invitations for bids shall "describe the supplies or services to be procured in sufficient detail to permit full and free competition.", by reference to applicable drawings, plans, specifications, and essential description. It continues:

* * * When an item cannot be adequately described because of its technically involved construction or composition, the name of one and if possible, several commercial products may be included as part of the required description followed by the words "or equal" to assure that bidding will not be limited to a particular make or makes specified. * * *

The latest ASPR's, not relevant in point of time to the present controversy, go further in requiring a description of such commercial product according to the nomenclature by which "such product is offered for sale to the public by the particular manufacturer" (ASPR 1–1206.-2(a)), and require that the invitation employing a brand name purchase description "set forth those salient physical, functional, or other characteristics of the referenced products * * *". All three branches of the Defense Department have implemented these ASPR provisions with procurement instructions, and in at least one instance the Air Force Procurement Instruction (AFPI Sec. 1–1206.2(b)) lists a number of characteristics which should be used, as needed, in expressing the Government requirements, including the kind of material. These current ASPR's and procurement instructions are mentioned not because they control the problem at hand, but because they may illuminate the Defense Department's purpose behind the embryonic "brand name or equal" language of the earlier relevant ASPR.

■ The plaintiff construes from this language that the Government can only employ the "brand name or equal" type of

description in an invitation for bids when the product or products referred to are in fact commercially available. We do not need to consider whether this view should always be applicable but under the particular circumstances present here, where the Government issues an invitation for a procurement item containing a component which is given a purchase description consisting of a brand name product manufactured by a designated company or its "approved substantial equal", and the designated manufacturer developed the procurement item in connection with a research and development contract immediately preceding the bid procurement in issue, it is the obligation of the Government to ascertain and assure to bidders the commercial availability of the component from its manufacturer before its employs it as a purchase description or, failing that, to provide bidders with a sufficient description of the physical specifications and performance characteristics so that it may be duplicated by the bidders either by inhouse fabrication or by purchase from suppliers. Here the Government did neither. It was improper for the Government to cast this burden of advance ascertainment upon the bidders without explicit warning to them of the questionable availability and physical makeup of the component.

The most reasonable expectation for plaintiff and other bidders was that the component would either be available from Western Electric or could be manufactured at a reasonable cost from plans which would be available. A Western Electric catalog number was given and this indicated commercial availability. The ASPR regulation on brand names would have the same effect. The reference to "approved substantial equal" would indicate that the Government had the plans by which to evaluate the substitute, and would make those plans available to the contractor; otherwise, there would be no means by which either the Government or the contractor could tell whether the substitute was in fact "substantially equal". The specific requirement that the substitute be "approved" by the defendant strongly reinforced this expectation. If the Government could not obtain the plans in order to make its evaluation, the purchase description specification would plainly be defective.

The Government, for its part, obviously knew that the resistor was connected with the research and development work Western Electric had done for the United States. The R&D contract is not in the record, but there is much evidence as to W.E.'s prior work, and the record is indisputable that the Government was intimately involved with that work, that it approved the drawings and specifications developed by W.E., and that in general the drawings and specifications were Government property. There is no doubt that the thermistor mount was an integral component of the missile system developed by W.E. for the Government and under its supervision. The only conclusions that can be drawn from this record are, first, that the defendant was in a far better position than plaintiff or any other bidder to tell whether the resistor would be available from W.E. and, if not, whether the plans would be available; and, second, that plaintiff and other bidders would reasonably expect either the component or the plans to be available to them on fair terms.[5]

The Government's contention is that the plaintiff could have averted its problem in the bidding stage by learning upon inquiry that Western Electric would

---

5. In WRB Corp. v. United States, 183 Ct.Cl. 409, 510–512 (1968), the court ruled that a requirement that "Portland cement binder" type of decking be used in performance was not a representation that such material was then available on the market. There are several significant differences from the instant case, but it suffices to point out that in the *WRB* circumstances no bidder could reasonably think that the defendant warranted the market availability of the general item called for, while here the special circumstances, stemming from the use of the brand name, called for exactly the opposite expectation.

neither sell its thermal resistors nor divulge its composition to permit duplication, and could have thereafter refrained from tendering a bid, which is by implication an assumption of risk argument. Positing the proposition in this fashion shifts the burden from the Government to the contractor to show justification, whereas since the Government's actual or imputed knowledge of the availability and uniqueness of the thermal resistor was necessarily superior to that of bidders because of its contract relationship to Western Electric, the question should not be whether the circumstances which existed excuse plaintiff from not making the indicated inquiries, but whether they excuse the Government for issuing an invitation to bid on a contract which it knew or should have found out could not be performed with a reasonable expenditure of effort and cost because of the unknown nonavailability of the thermal resistor or its material specifications. If plaintiff assumed the risk of failure, did not the Government with less excuse risk impossibility of performance? [6]

We think this latter question is answered largely by the almost certain probability that had the Government known what it should have known it would not have issued invitations for competitive bids, but would have secured its needs by a negotiated contract with Western Electric. Without doubt the Government anticipated that the successful bidder would have no difficulty in obtaining the thermal resistor either by purchase or manufacture. Even though the thermal resistor was the only component of the thermal mount for which the specifications did not provide material data for its manufacture—and this showed clearly by omission in the relevant drawings—the presence in the same drawings of Western Electric's part number would create the justifiable belief that it was available as a catalog item should a purchase be in the bidder's plans, while the knowledge that the Government normally obtains technical data from its research and development contractors would create by rebuttable presumption the equally justifiable belief that, in soliciting competitive bids, the Government would provide the material specifications for the resistors to bidders intending in-house manufacture. Under these circumstances, in order to avoid an erroneous impression to bidders, it was a more grievous fault for the Government not to warn bidders of the potential problem of obtaining or manufacturing resistors, than it was for the plaintiff to fail to make advance inquiry.[7] We think the Government recognized this situation when it offered to terminate the contract for convenience of the Government in order to make the plaintiff whole, and to a partial extent when it granted plaintiff a time extension which impliedly freed plaintiff of the onus of blame for the delay, although it did not constitute an admission of fault by the Government.

The sorting out of duties arising from the conflict between the plaintiff's assumption of risk in bidding on a contract without thorough inquiry, and the obligation of the Government to disclose factors of substantial influence on contract performance depend on the three general situations producing the problem: The Government may know but conceal, or not know and not be charged with

---

6. Impossibility, that is, in the sense described in Section 454 of the Restatement of the Law of Contracts, which includes "impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved". The impossibility is not diluted by the eventual procurement of acceptable resistors from U. S. Dynapower after a five-month search. Cf. Natus Corporation v. United States, 371 F.2d 450, 178 Ct.Cl. 1 (1967).

7. This despite the boilerplate term of the invitation placing the risk on bidders for not examining drawings, specifications, schedule and all instructions in the preparation of bids. Under the circumstances in this case, as has been pointed out, it was not at all obvious that the Western Electric or equal resistors were not procurable, and plaintiff had good reason to believe that the Government had and would make available the material specifications.

knowing, or not know yet be legally charged with the knowledge because of its superior opportunity (or other factors warranting a bidder's reasonable expectations). The earned consequences in the first and second instances are predictable, but in the third the responsibility should be determined on the basis of the balance of fault and reasonable expectations, with the outcome dependent on the particular circumstances of the individual case. A comparable balancing in Helene Curtis Industries, Inc., v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963), benefited the plaintiff, with the court stating 312 F.2d at p. 778, at p. 444:

> * * * the Government had sponsored the research and knew much more about the product than the bidders did or could; * * *. Although it is not a fiduciary toward its contractors, the Government—where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word. * * *

We have weighed the balance in this case and, for reasons given earlier, feel that here there is no doubt that the Government had the greater degree of fault and also that the contractor reasonably anticipated the availability of either the component or the plans.

From the foregoing considerations it is evident that the specifications were deficient and, there being an administrative remedy under the Changes clause via the constructive change route (we are mindful of the Board's repeated willingness to recognize and entertain comparable situations as redressable under that clause) [8] the existence of this administrative remedy suffices jurisdictional requirements for the purposes of our review capacity under the Wunderlich Act. The particular changes in this situation would be (1) the nonavailability of the

Western Electric thermal resistor contrary to the representation that it was a commercial product and thus, by implication, commercially available, and (2) the nonavailability of material specifications for the resistor, which were not affirmatively promised by the invitation documents but were by implications since they would have been necessary for the plaintiff and the Government to have if they were to be able to produce and approve, respectively, a substitute product as being a "substantial equal". Were these not to be deemed constructive changes for relief under the contract, there should be little difficulty in utilizing the same reasoning processes to establish an innocent misrepresentation or a breach of warranty, either of which theories would support a recovery for breach of contract, for which reason we omit discussion of plaintiff's alternative counts 2 and 3.

## PART II

### Absence of Testing Data

The deficiency of testing data in the specifications, which plaintiff says constitutes a reimbursable change under the contract, and which again is more a matter of legal consequences than it is of factual resolution and therefore deprives the Board's adverse decision of Wunderlich Act finality, arose under the following circumstances:

The drawings for the thermal resistor referred to earlier contain the instruction: "3. For electrical data see C8520186." Drawing C8520186 depicts schematically the matched thermal resistors and contains three notes constituting "Requirements", the first of which provides:

1. With 8519623 [one of the resistors] biased to 125 ohms ± 1 ohm and the thermistor attached to a standing wave detector or 3-frequency test set, the VSWR [volt standing wave ratio] shall be 1.4

---

8. Seaview Electric Company, ASBCA 6966, 61–2 BCA ¶ 3151; Regent Manufacturing Company, Inc., ASBCA 5397,

61–1 BCA ¶ 2956; J. W. Hurst and Son Awnings, Inc., ASBCA 4167, 59–1 BCA ¶ 2095, among others.

max at the three test frequencies of 8500, 9100 and 9600 MC.

Another contract drawing, No. 8010866, depicting the entire thermistor mount, contains in Note 6 certain additional testing data of a highly technical nature which is only slightly less indecipherable in appearance than it is incomprehensible in substance to the lay reader. The drawings referred to, however (readable by bidders, we trust), collectively provide the sole testing information given to the plaintiff in the invitation portfolio. For reasons which will appear it was not adequate, to which the defendant observes that there was no obligation under the contract to provide testing data to bidders since it was a performance type specification which tacitly left the responsibility for correct testing procedures up to the successful contractor.

When plaintiff completed test models of the thermal mount in September 1959 it procured and set up a bank of standard test equipment but was unable after a month's effort to extract from it the readings required by the drawing data. In October it engaged the services of a competent testing laboratory, which was similarly unable to produce required results with the testing data provided in the contract documents. The problem in essence seemed to be that, whereas drawing No. 8520186 required that the resistor depicted in drawing No. 8519623 be "biased to a maximum resistance of 125 ohms ± 1 ohm, etc.", to do this a bolometer measuring 125 ohms plus or minus 1 ohm was not available on the market or from the Government, there being only a standard type available for measuring RF power utilizing 100 or 200 ohm thermistors, the use of which in measuring the 125 ohm resistance of the subject resistor caused a mismatch condition which, in turn, produced an erroneous VSWR (volt standing waive ratio). The record shows conclusively that, in order to use standard equipment for testing under these conditions, it (the equipment) had to be used in tandem with a handcrafted slotted line device eventually developed by plaintiff for biasing the resistor to

100 ohms, and then reading the result by applying three subtraction factors, one for each of the frequencies specified in the drawing.

The extreme difficulty in solving this testing problem is indicated by the record of efforts made jointly by plaintiff and Government representatives over a period of over five months before a solution was reached and the thermal mounts found to comply with performance requirements. Thus, on February 4, 1960, representatives of plaintiff and the Government conferred over the problem, and all agreed that the thermistors could not be tested completely due to the fact that the specifications did not show how the bolometer resistance of 125 ± 1 could be obtained. It was further agreed at this conference that the specifications should be amended to furnish plaintiff additional testing information and/or a mathematical factor be furnished which would allow interpolation of the mismatch condition. A thermistor was given for evaluation to the Redstone Arsenal, where by February 15 it had been tested in accordance with the same procedure used by plaintiff and with the same inconclusive results and shortcomings. Redstone officials were sincerely trying to furnish plaintiff with information to allow complete and proper testing. As of February 29, 1960, the opinion of the Army Ordnance Corps was that test procedures used by plaintiff complied with contractual requirements, even though the results were not as required. The problem was not that the test samples did not pass muster, but that the test procedures followed would not permit such a determination.

Plaintiff and Redstone Arsenal persevered in their search for a solution. On March 4, 1960, the AF Quality Control Officer certified that: "The undersigned agrees that the Government cannot accept the Thermistors due to the inadequacy of the testing procedures contained in the Contract. Further, he requests that adequate procedures be furnished." As of March 12, 1960, a Government representative advised an inter-

party conference that he could not obtain a procedure to reduce or eliminate the mismatch condition at Redstone Arsenal, and that he believed the specifications to be incomplete and intended to continue his efforts. At a further inter-party conference on March 21, 1960, "It was agreed by all of the parties in attendance that the problem relative to testing * * * had not been resolved by Birmingham Ordance. The Contractor had asked * * * that he be furnished with additional testing information and/or a mathematical factor that would allow interpolation of the mismatch; however, same had not been furnished."

Through April, May, and part of June 1960 the plaintiff anxiously awaited advice from the Government as to testing procedures. Finally, on June 9, 1960, the Government advised plaintiff that three thermal mounts supplied for testing were acceptable, that plaintiff's testing procedures complied with contract requirements, and that thermal mounts to be supplied by plaintiff which measured up to the three which had been tested would be accepted under the contract. This was confirmed at a conference between the parties on June 23, 1960, at which—

> It was agreed by all the parties in attendance that the problem relative to the inadequacy of the testing information contained in the contract had been resolved by the information contained in reference letter [referring to the Government's letter of June 9, 1960, to plaintiff]. The Test Tabulations from the Redstone Arsenal Laboratory set forth in the aforesaid letter have enabled the Contractor to establish a correction factor based on data arrived at from these tests.

The solution finally discovered by the Government and given to plaintiff after about five months of casting about consisted of a conversion of test results by application of three subtraction factors, one for each of the frequencies specified in drawing No. 8520186, viz: .2 for 8500 MC, .04 for 9100 MC, and .13 for 9600 MC. By biasing the resistor to 100 ohms with the use of standard power-meters and the slotted line set-up devised by plaintiff, instead of to 125 ohms plus or minus 1 ohm as set forth in drawing No. 8520186, and then applying the appropriate substraction factor to each frequency, the required volt standing wave ratio of 1.4 maximum was obtainable. With this information as the key, the plaintiff thereafter successfully tested all of the end items and delivered them promptly to the Government in accordance with a revised delivery schedule provided by Modification Agreement No. 3 to the contract.

Even though the invitation did not affirmatively promise that test procedures would be provided by the Government, and was primarily a performance-type specification, the inclusion therein of incomplete testing data would naturally lull bidders into thinking that it was sufficient unless a specific warning to the contrary were given. Such belief on plaintiff's part was undoubtedly shared by some of the Government scientists who were researching a solution to the dilemma, for otherwise they would have merely dumped the problem in plaintiff's lap without undertaking to solve it. Nor would they have been likely to agree in writing—as they did on three occasions —that the testing procedures provided by the contract were incomplete and inadequate, nor have urged that proper procedures be furnished by the Government, unless they felt some measure of responsibility existed based on the contract relationship. It is not enough for the Government to say, as did the Board before it, that because it was a performance-type specification, the contractor was obligated to select whatever method it desired to produce the required result. This oversimplifies the burden and allows no escape hatches to accommodate special circumstances such as exist in this instance.

If we place ourselves in the position of the plaintiff as a bidder examining the specifications and drawings for the purpose of submitting a bid, it is not likely that it would occur to us that there would be any difficulty in testing the

thermistor mount, no more than it occurred to the contracting agency in preparing the invitation documents. Each party at that time was aware that the device was a carbon copy of one which had been successfully developed, manufactured, and tested by Western Electric just two years before, and it would be most natural for all concerned to assume that the method of testing imposed no particular obstacle. There would be, however, a somewhat different basis for this assumption on the Government's part than the plaintiff's. The plaintiff could rightfully assume that the Government, if it had not itself performed the tests on Western Electric's mount, would at least know the procedure followed, for how else would the Government have been able to accept Western Electric's mount as conforming to requirements unless it was privy to the testing? To merely have Western Electric's word for the fact of compliance would not convince normally skeptical Government inspectors. As between the plaintiff's duty to inquire and the Government's duty to inform, we believe the equities lies against the latter, essentially because the plaintiff was innocently misled by the contents of the invitation coupled with the surrounding circumstances which imputed more knowledge to the Government than it apparently possessed.

In rejecting the plaintiff's contentions on this count, the Board considered the plaintiff to be "neglectfully unaware that standard testing equipment was usable with the addition of standard adapters.", apparently overlooking the absolution of negligence bestowed by the time extension granted plaintiff by Modification Agreement No. 3. This agreement was both a governmental determination and a governmental concession that plaintiff was not negligent. Moreover, the Board was very clearly incorrect in saying that standard equipment with standard adapters sufficed testing requirements, since the nonexistence of standard bolometers geared to test a resistance of anything other than 100 or 200 ohms compelled plaintiff to improvise a slotted-line device to link to standard equipment to effect the testing, and even then corrective factors had to be applied which the Government did not know but should have known because of its experience under the prior Western Electric contract. The inability of the commercial laboratory engaged by plaintiff to achieve satisfactory testing results demonstrates both the plaintiff's diligence and the project's difficulty which was not susceptive to anticipation, as obliquely corroborated by the contrast between the 180-day delivery requirement for end items and the five months plus that it took the Government to develop a suitable testing procedure. Furthermore, the Government approved the plaintiff's testing procedure itself as being correct, which narrows the problem to the corrective factors as the missing link left on the Government's doorstep.

It is permissible to consider that the perfection of the testing procedure by the Government's delayed furnishing of mathematical correction factors constituted a clarifying alteration of deficient specifications and hence a reimbursable change under the contract, particularly so since the Board accepted jurisdiction of plaintiff's claim so presented even though it disagreed with plaintiff's premise. Plaintiff's alternative counts in breach of contract are thus rendered moot.

The plaintiff is accordingly entitled to judgment on the issue of liability, with the amount of the equitable adjustment to be determined by the originating Board within six months.

## CONCLUSION

In accordance with the above opinion, and to the extent indicated therein, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. Judgment is entered for plaintiff on the issue of liability with proceedings here to be sus-

pended for six (6) months, to afford plaintiff an opportunity to obtain determination of the amount of the equitable adjustment through further Board proceedings, pursuant to Rule 167.