**MORRISON–KNUDSEN COMPANY, INC.,**
**Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1573.**

Supreme Court of Alaska.

March 11, 1974.

---

**21.** Alaska Rules of Appellate Procedure, Rule 7(a) (formerly Alaska Supreme Court Rule 7(a)).

J. B. Bradley, Robertson, Monagle, Eastaugh & Bradley, Juneau, Richard M. Stanislaw, DeGarmo, Leedy, Oles & Morrison, Seattle, Wash., for appellant.

Dorothy Awes Haaland, Richard P. Kerns, Asst. Attys. Gen., Anchorage, John E. Havelock, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN and BOOCH-EVER, Justices.

## OPINION

CONNOR, Justice.

On November 5, 1964, plaintiff-appellant Morrison-Knudsen ("M–K") entered into a construction contract with the State of Alaska to perform work at the Sitka Airport on Japonski Island. A claim for additional compensation arising out of the contract evolved into a nonjury trial lasting seven days in the superior court. The sole issue for determination was that of liability, the parties having stipulated to reserve the question of amount of liability. On November 25, 1970, the trial court rendered its findings of fact and conclusions

of law granting judgment in favor of defendant-appellee State of Alaska. Subsequently, the superior court awarded the state its costs, including attorney fees in the amount of $22,633.91. This appeal challenges both the judgment of nonliability and the award of attorney fees.

In the early 1960's the State of Alaska, Division of Aviation, retained the joint venture Galliett & Silides to investigate the need for an airport at Sitka, Alaska, and to determine what, if any, runway alignments would be possible there. During October, 1962, as part of the second stage of their assignment, Galliett & Silides investigated the ocean floor at Whiting Harbor and the areas on the outside of a causeway in an attempt to find possible sources of materials. Probes[1] of the ocean floor by a scuba diver indicated that the bottom was easily penetrable. Random sampling retrieved buckets of stones from the surface of the ocean floor ranging from 2 to 4 inches in diameter. While sitting in his skiff during the investigation, Mr. Silides observed stones 12 to 14 inches in diameter where the water was shallow enough to see bottom. Their investigations completed, Galliett & Silides reported to the Division of Aviation, *inter alia*, that

"This apparently dredgable material is found on all sides of the existing causeway and islands at various depths, ranging down to approximately 45 feet below mean time [*sic*] and extending from [*sic*] undetermined depth."

In late May, 1964, the state retained John D. Ballard in connection with the project. Ballard's primary responsibility was to determine the stability of the ocean bottom sediments where the runway would be placed. Based on his observations of these sediments, he was also asked to estimate possible quantities of fill they might yield. Ballard submitted a one-page supplement to his report, which he also reduced to a drawing, outlining three probable areas where dredging might yield enough fill materials for the runway. These areas he defined so as not to preempt a contractor's choice of dredging equipment.[2] For example, the areas were confined within 3000 feet of the runway to prevent the use of a booster which might discourage the utilization of a hydraulic dredge.

Later that spring, the State Division of Aviation prepared a design of Sitka Airport which was ultimately issued to bidders on August 21, 1964, calling for a bid opening date of October 8, 1964. Included in the documents furnished to the bidders, but not designated part of the project specifications, was a drawing entitled "Areas *Proven* Suitable For Dredging," (emphasis added) apparently based on the Ballard drawing but varying it by extending Ballard's area no. 1 beyond the sheltered portions of Whiting Harbor.[3] Accompanying

1. A "probe" is a heavy iron bar, about 10–12 feet long, which is used to test the hardness of the bottom.

2. Dredging is simply a technique for removing earth or similar material. Usually it takes one of two forms: suction tube or buckets on an endless (*i. e.*, circular) chain. There are at least six types of machines ("dredges") used for underwater dredging: hoppers, hydraulic cutterheads, hydraulic suctions, buckets (or "ladders"), clamshells, dippers.

A hydraulic suction dredge (also known as a hydraulic dredge or suction dredge) is essentially a centrifugal pump mounted on a barge. Material is pumped from the ocean floor, through a suction pipe, up to a barge, and onto a floating pipeline: A shore pipeline may be connected allowing material to be deposited at a required location on shore. A typical hydraulic dredge is able to draw material from a depth of 25 to 60 feet.

Of all the methods for underwater dredging, hydraulic dredging is the cheapest. It is also the most sensitive. It cannot be used at depths of more than 60 feet. It cannot handle materials greater than two-thirds of the diameter of the discharge lines (*i. e.*, a 12-inch diameter pipeline can accommodate rocks no greater than 8 inches in diameter). Finally, it is easily upset by ocean swells, and cannot be operated in high winds or in rough weather.

3. The trial court found—and is not challenged by M–K for so finding—that "the question of misrepresentation does not revolve around whether the areas were so proven, but whether they were in fact suitable for dredging."

this drawing was Ballard's Subsurface Investigation Report, which was also not part of the specifications, but which was made available to provide prospective bidders "with the same basic soils information that the state possesses relative to the Sitka project."

Also included in the documents were the following provisions:

1. A requirement that each bidder carefully examine the work site for himself;

2. A specific disclaimer (a) of guaranty of the soil information and (b) of liability for extra work occasioned by any variance between the actual soil or material conditions and those indicated by borings;

3. Permission for the contractor to dredge wherever he chose so long as he kept sufficiently distant to avoid damaging the landing strip embankment and the existing causeways connecting Japonski Island with the other islands;

4. Permission for the contractor to use whatever equipment he wished so long as it was in satisfactory condition and was of sufficient capacity to maintain the embankment schedule;

5. A reiteration of the work site examination requirement and the specific disclaimers of guaranty of soil information and liability for extra work;

6. An absolute prohibition of oral modification of the contract.

Aner W. Erickson was the man in charge of preparing M–K's bid. To familiarize himself with the project requirements, he:

—read the plans and specifications;

—traveled to the site with these documents in hand;

—walked the length of the causeway;

—viewed the three dredge areas from the shore (but did not attempt to go out over them in a boat);

—generally studied the total configuration as it related to all phases of the job.

Based on the documents and on his observations insofar as they seemed to confirm the documents, Erickson concluded that hydraulic dredging would be economically feasible. Upon his return to Anchorage following this site examination, he requested American Dredging Corporation of Alaska to give him a price on the Sitka dredging. Ken Martin, president of American Dredging, flew to Sitka and returned shortly with the figure which M–K used in preparing its bid. Ultimately M–K entered a subcontract agreement with American Dredging.

Meanwhile, other prospective bidders had been conducting their own investigations at the site. In July, 1964, S. S. Mullen, Inc., took samples with a clamshell dredge. Some of the samples contained boulders.[4] On or about September 1, 1964, Marquand S. Gorton[5] looked at the dredging portion of the job for PNZ Constructors to make an estimate of the cost. Gorton cruised over the dredge areas in a boat to test their suitability specifically for hydraulic dredging.[6] Upon looking down into the

4. Albert W. Wilson, the State's resident engineer at the Sitka Airport project, was present on the S.S. Mullen clamshell rig during this investigation.

5. It appears that Gorton had conducted investigations in the general area back in 1963. At that time, while dredging in the Wrangell Narrows, he apparently received word from the Corps of Engineers' resident engineer in Juneau that the state was considering build-

ing an airport on Japonski Island. Gorton took a scuba diver from his crew over to Whiting Harbor to determine what type of materials might be available there.

6. PNZ had a hydraulic dredge returning to the West Coast at about this time from Kwajalein. Ultimately his plan to test the area further with a pile driver was never carried out.

water, he observed "a great many boulders sprinkled" over the bottom. In addition, he noted that parts of the dredge areas were obviously exposed to swells, waves, and wind. Based on these observations he concluded that it would be extremely difficult to use a hydraulic dredge economically.

Gorton related his conclusion to both Albert W. Wilson, resident engineer at the project, and the Mayor of Sitka. As an alternative to the proposed dredge areas, he requested that the Indian River deposit be made available as a materials source. The state, however, would give no assurance of Indian River's availability, and PNZ declined to bid on the project.

All of the bids exceeded the engineer's estimate. Of the five bidders who submitted an alternate bid schedule, M–K's bid on the Class D Core Embankment (for which the dredged fill would be required) was the lowest, with a unit price of $1.74 per yard. Second lowest was S. S. Mullen, Inc., with a unit price of $1.75. The engineer's estimated unit price was $1.18.

Immediately after the bid opening, Erickson called Richard Downing (State Commissioner of Public Works during the relevant period) and requested as low bidder an opportunity to negotiate a lower contract price before the state rejected all bids as too high. There is evidence in the record to the effect that one of the men negotiating with Erickson on behalf of the state—one James Moody—approached Erickson during negotiations and asked him whether he intended to make a claim against the state in the event the borrow

pits (dredge areas) were not as represented.[7] In any event, the contract was finally signed on November 5, 1964, *inter alia*, restoring dredge area no. 1 to its original location.

Shortly thereafter, on return to M–K's Seattle office from a vacation in California, Erickson was confronted with a report (the source of which turned out to be Gorton) that the state's designated dredging areas contained nothing to dredge. Complicating matters even further, American Dredging "had dropped out of the picture."[8] Erickson set up a meeting with Gorton, as a result of which he engaged Gorton (1) to supervise an exploration to determine whether there existed sufficient quantity and quality of material for a hydraulic dredging operation, (2) to aid in evaluating the exploration, and (3) to be M–K's agent in negotiating a new subcontract if the investigation showed hydraulic dredging to be feasible. Based on the findings of this exploration, the M–K staff concluded:

> "[t]hat it was totally impossible, unrealistic to consider hydraulic dredging in areas 1, 2, and 3 or into the so-called extension into Whiting Harbor."

On February 1, 1965, Erickson notified the Division of Aviation of his conclusions and asked the state to rectify the situation. Ultimately M–K obtained the necessary fill from Leesoffskaia Bay (also known as Lee's Bay) via a 7 cubic yard drag line. Material was loaded onto barges and hauled the 5 miles to the work site. Apparently no attempt was made to dredge hydraulical-

7. Erickson was the only witness who testified to the event. He alleges he replied that so long as he could get 800,000 cubic yards of materials out of the 2.3 million cubic yards represented to be in Areas 1, 2, and 3 and so long as the state would make part of Whiting Harbor available if necessary, he would have no claim. Moody was apparently present at the trial but was called by neither side.

8. American Dredging appears to have represented to Erickson that its financier, one Louis

Duien, had committed himself to assist it in buying a dredge. Duien seems to have changed his mind on the purchase sometime after the subcontract agreement was signed with M–K. M–K, meanwhile, had requested but never in fact received a performance bond from American Dredging. Ultimately, American Dredging wrote Erickson a letter asking if they could withdraw from the project without suit. Permission apparently was granted.

ly or by any other means in the designated areas.

On August 14, 1965, M–K filed a formal claim against the state. As part of its investigation therein, the state hired Harry Lee, Jr., a consulting engineer, to determine whether off-shore borrow materials existed in the Sitka airport area.[9] As part of his investigation, Mr. Lee conducted tests with a clamshell dredge. In a report submitted March 14, 1966, Lee concluded that some 1.7 million cubic yards of material was recoverable in the immediate vicinity.

In a letter dated April 11, 1966, the Contracting Officer denied M–K's claim for additional compensation.

On or about June, 1966, the state requested a second opinion on dredging methods in general and hydraulic dredging in particular from William O. Owens, engineer, Corps of Engineers, retired. Confining his observations to the Ballard Report for analytical purposes, based on the weather conditions 14 feet from the surface of the sediments, and the exposure of the area to ocean storms and swells, Owens concluded that hydraulic dredging would not be feasible. In his opinion, the most feasible technique would be dredging with a large clamshell dredge.

On July 7–8, 1966, the Contract Claim and Review Board held hearings on the matter. It was their recommendation that M–K's claim be denied on the grounds that it was not supported by evidence presented to the Board or by testimony adduced at the hearing. Following trial de novo in the superior court, the trial court rendered findings of fact and conclusions of law granting judgment in favor of the state.

This appeal followed.

M–K contends that the specifications submitted to bidders by the state led it reasonably to believe that hydraulic dredging was feasible, when in fact the state possessed information proving that it was not. Furthermore, during subsequent negotiations when M–K informed the state of its plan to use hydraulic dredging, the state made no attempt to dissuade it. The state denied having represented hydraulic dredging to be feasible. In any event, it claims, M–K did not rely on its representations and was not mislead thereby.

I

## THE STATE'S DUTY TO DISCLOSE INFORMATION IN ITS POSSESSION

The single most important issue raised in this appeal concerns the extent to which the state was under a duty to reveal information it had received from S. S. Mullen, Inc., and from Marquand Gorton bearing on the feasibility of hydraulic dredging at the construction site.

An abstraction of the problem may be helpful. State S solicits bids on Project P. In the course of preparing their bids, Contractor A shares with the state the results of some tests it has conducted at the work site which bear on the feasibility of potential operational technique #1 and Contractor B explains to the state why, in its opinion, technique #1 is not likely to be feasible for this project. Subsequently Contractor C, who has independently examined the site, submits a bid based on the availability of technique #1. All the bids are too high, but C, as low bidder, requests an opportunity to negotiate a contract with S. During these post-bid opening negotiations, is S under a duty to inform C about A's tests or B's opinion and, if so, to what extent?

Appellant cites us to, and we take considerable guidance from, a line of cases developing in the United States Court of Claims.[10] The seminal decision appears to

9. Lee was somewhat uncertain as to whether his connection with the state in this case began in 1964 or 1965.

10. We assimilate the standard of disclosure imposed by the Court of Claims upon the United States to the duty owed by the State of Alaska to contractors from whom it solicits bids.

be Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963). That case concerned a contract for the manufacture of a product, an essential ingredient of which was a novel chemical (chlormelamine) about which there was little if any available information at the time of the contract. An expensive grinding process was required before the novel chemical could be used, 312 F.2d 775–776, yet the government gave plaintiff-contractor no hint that the grinding process would be required. 312 F.2d at 777. In imposing liability, based on the government's duty to share information in its possession, the Court of Claims rested its decision on (1) the novelty of the chemical involved (it had never been mass produced) and (2) the government's status as sponsor of all research that had been done on the chemical:

"[T]he Government had sponsored the research and knew much more about the product than the bidders did or could; . . . . Although it is not a fiduciary toward its contractors, the Government —where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word." 312 F.2d at 778 (emphasis added).

The Helene Curtis Industries case and the question of the government's duty to disclose came up again in Aerodex, Inc. v. United States, 417 F.2d 1361, 189 Ct.Cl. 344, 1969). Aerodex concerned a procurement contract under which plaintiff-contractor agreed to supply probe thermistor mounts, the nerve center of which is a matched set of thermal resistors. 417 F.2d at 1363. The resistors were the only component (of the 35 total components) not described in the contract. Rather, dimensions and performance requirements were given. Plaintiff-contractor expected to obtain the material specifications for the resistors from the government and manufacture them in-house rather than buy them ready made. Accordingly it made no inquiries during the bid period, either about

resistor availability from Western Electric (who had already produced the resistor sets under an earlier government contract and were cataloguing them as apparently available for individual purchase), or about availability from other suppliers, or about the availability of the material specifications from the government.

In concluding that

"[i]t was improper for the Government to cast this burden of advance ascertainment upon the bidders without explicit warning to them of the questionable availability and physical makeup of the component[,]"

the Court of Claims noted that

"there is much evidence as to W[estern] E[lectric]'s prior work, and the record is indisputable that the Government was intimately involved with that work, that it approved the drawings and specifications developed by W[estern] E[lectric], and that in general the drawings and specifications were Government property. There is no doubt that the thermistor mount was an integral component of the missile system developed by W[estern] E[lectric] for the Government and under its supervision. The only conclusions that can be drawn from this record are, first, that the defendant was in a far better position than plaintiff or any other bidder to tell whether the resistor would be available from W[estern] E[lectric] and, if not, whether the plans would be available; and, second, that plaintiff and other bidders would reasonably expect either the component or the plans to be available to them on fair terms." 417 F.2d at 1366 (emphasis added).

One of the most recent cases to come out of the Court of Claims on the subject of the government's duty to disclose is Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364, 198 Ct.Cl. 472 (1972). The contract there involved construction of the "first increment" of a U. S. Navy radio communications facility at North West Cape, Western Australia. 458 F.2d at 1365.

Prior to the invitation for bids, various studies were made by the Western Australia Department of Public Works in connection with the design and location of the pier. The first report, submitted by a Captain Piggford, was extremely unfavorable to the site ultimately selected. 458 F. 2d at 1365–1366. A second report, submitted by a Captain Drexel, was also unfavorable to this site.

Plaintiff-contractor examined the site and inspected weather data available at Vlaming Head Lighthouse. In the course of its investigation, plaintiff learned of the existence of the Piggford and Drexel reports. When it asked the Western Australia Department of Public Works for permission to examine their contents, permission was flatly refused on the ground that the reports were prepared solely for the U. S. Navy. When plaintiff then sought permission from the Navy to examine the reports, it was again refused, this time on the ground that the Navy expected bidders to make their own site investigation. 458 F.2d at 1367.

The Court of Claims granted relief on the theory that there was a breach of contract as a matter of law:

"It is well settled in this court that where the Government possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract, the Government has an affirmative duty to disclose such knowledge. It cannot remain silent with impunity. Helene Curtis Indus., Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963). *See also, e. g.*, Aerodex, Inc. v. United States, 417 F.2d 1361, 189 Ct.Cl. 344 (1969); J. A. Jones Constr. Co. v. United States, 390 F.2d 886, 182 Ct.Cl. 615 (1968).

"In the instant case it is apparent that (1) the Piggford and Drexel reports which were possessed by the Government contained vital information concerning the weather and sea conditions at the site; (2) the weather and sea conditions were of paramount importance in the

performance of the contract; (3) the Government deliberately chose not to reveal the information contained in the reports to the contractor—even when expressly requested to do so by the contractor; (4) the contractor bid with knowledge of the existence of the reports, but without knowledge of their contents; and (5) the contractor encountered adverse weather and sea conditions which were not reasonably foreseeable, thereby resulting in lengthy delays in the performance of the contract.

"Under these circumstances the board reached the conclusion that the Government should have disclosed the contents of the reports to the contractor. We agree. There was no justifiable or excusable reason for the Government's refusal to disclose this vital knowledge to the contractor. The court holds that, as a matter of law, the defendant had a duty to disclose and share its superior knowledge and the failure to discharge this duty constituted a breach of contract. Helene Curtis Indus., Inc. v. United States, *supra*." 458 F.2d at 1371–1372.

We read these cases as establishing the following test for imposing a duty to disclose upon the state: did the state occupy so uniquely-favored a position with regard to the information at issue that no ordinary bidder in the plaintiff's position could reasonably acquire that information without resort to the State? Where resort to the state is the only reasonable avenue for acquiring the information, the state must disclose it, and may not claim as a defense either the contractor's failure to make an independent request or exculpatory language in the contract documents. Thus in *Helene Curtis Industries*, the government "knew much more about the product than the bidders did or could" by virtue of having sponsored all the research that had been done on chlormelamine, 312 F.2d 778; in *Aerodex*, the government "was in a far better position than . . . any . . . bidder to tell whether the [thermal] resistor would be available from W[estern] E[lectric]" by vir-

tue of its intimate involvement with Western Electric's work on the resistor, 417 F.2d at 1366; and in *Hardeman-Monier-Hutcherson*, the government possessed "vital information concerning the weather and sea conditions at the site" by virtue of having commissioned the Piggford and Drexel reports, 458 F.2d at 1371–1372, which were not generally available. Liability was imposed in all three cases, even though the contractor specifically requested the government's information only in *Hardeman*, and even though the contracts in all of the cases contained exculpatory clauses.

■ Measured against this standard, it is clear that the State of Alaska occupied no comparably-favored position vis-a-vis the information at issue here. Far from knowing more than "the bidders did or could," the state failed to disclose only what two other bidders on the very project had told it. Nor was the information acquired by those bidders with special technical assistance supplied by the state. S. S. Mullen, Inc., and Gorton merely took boats out over the proposed dredge areas. Mullen, Inc., to be sure, actually took samples with a clamshell dredge. But all Gorton did was look down into the water. From our review of the record, it is not clear that the state was in a position to evaluate the opinions of S. S. Mullen and Marquand Gorton as to the feasibility of hydraulic dredging. In this regard the trial judge specifically found that nothing in any of the oral or written communications or negotiations between M–K and the state supported "an inference of misrepresentation, concealment or other deceit on [the

state's] part. There has been no proof of fraud in any aspect of the case."[11] In this connection we note that subsequent to the negotiated contract and after M–K was informed of the first Gorton report M–K engaged Gorton to supervise exploration for the purpose of determining whether hydraulic dredging was feasible. We think M–K could easily have conducted equally extensive research on its own, and was not dependent on the state as the only reasonable avenue for acquiring that information. Accordingly, we hold that the state did not breach its duty to appellant in failing to disclose information it had received from the other bidders on the project.[12]

II

## ALLEGED MISREPRESENTATIONS IN THE CONTRACT DOCUMENTS

■ In addition to its charge of concealing information, appellant enumerates four "positive misrepresentations" that the state allegedly made in the contract documents:

—That the map attached to the Ballard Report in the contract was a copy of the map which was prepared by Mr. Ballard;

—That the areas indicated on the map as having been "proven suitable for dredging" had in fact been proven suitable for dredging;

—That the dredging areas contained the quantities of material therein stated, free of cobbles and boulders, at not

11. In support of this conclusion the trial court further found "Neither [the Ballard and Galliett & Silides reports] nor any other factual information known to [the state] prior to the signing of the contract contained any significantly different, inconsistent or additional matters which would have changed what was represented in the documents provided to [M–K]."

12. Our ruling covers the state's duty and conduct during both the bid-solicitation and the post-bid negotiation phases of the contracting.

Appellant argues that the state was also under a duty to disclose the report prepared by Galliett & Silides in 1962, which allegedly contained information tending to show that hydraulic dredging would not be feasible. We are satisfied that appellant was not dependent upon the state for the information on boulders in the bottom sediments contained in the Galliett & Silides report. Appellant could easily have acquired this information by itself. We therefore find no merit in appellant's argument.

deeper than ten feet below the surface of the sediments;

—That the Ballard Report was the "same basic soils information" possessed by the state, when in fact the state possessed the Galliett & Silides report as well.

With regard to the first, we find it difficult to see where this "misrepresentation" made extra work or expense necessary. The negotiated contract between M–K and the state signed on November 5, 1964, restored area no. 1, the major distortion of Ballard's drawing, to its original location. Thus appellant could not have relied on this representation to its detriment in its performance under the contract.

■ With regard to the second, the trial court's undisputed finding was:

"While it might be inaccurate to describe the areas as 'proven', the basis for the information on the map was shown in the estimate to be the six test holes that were drilled, only one of which was within a 'dredge area' as redrawn in Addendum No. 4 prior to signing of the contract. Thus, the question of misrepresentation does not revolve around whether the areas were so proven, but whether they were in fact suitable for dredging."

Since the record amply supports a finding that the areas were in fact suitable for dredging, we hold that there was no misrepresentation.

■ With regard to the third, the Lee Report confirms within reasonable limits Ballard's estimate of the quantities of material in the dredging areas. As to appellant's allegation that Ballard's report represented the dredging areas to be free of cobbles and boulders, we think it is based on a misreading of the supplement to § 2 of the report. This supplement describes each of the six test holes by death of sedi-

ment, encounter with boulders, and encounter with bedrock. In two of the six test holes, boulders were encountered at depths of 14 to 15 feet. Therefore, the text of the supplement explains, an average sediment depth of 10 feet was used.

In our opinion, the only reasonable inference to be drawn from the supplement was that cobbles and boulders were far less likely to be encountered at depths of 10 feet than at depths of 20 feet. Appellant, however, insists that this supplement warranted the first 10 feet of sediment to be boulder and cobble free, especially in light of the caption "Proven" on the accompanying drawing. A broader view of the context of both the one-page supplement and the drawing renders appellant's position less tenable. Specifically commenting on these appendages to § 2 of the report, the Special Notice to Bidders dated July 31, 1964, stated:

"Appended to the report is a print showing the approximate location of areas considered suitable for dredging operations if additional borrow material is needed in construction."

Ballard's own conclusion from his findings related largely to sediment stability. Nowhere did his report say that the first 10 feet of sediment was cobble and boulder free. Rather:

"In general, the materials in the shallower depths, i. e., less than fifty feet, contained a higher proportion of sands and gravel than materials from depths of over sixty feet." Ballard Report § 2, at 11.[13]

We hold that in this context, the caption "Proven" did not warrant the condition of the top 10 feet of bottom sediments.

■ Finally, with regard to the last, we find ample support in the record to sustain the description of the Ballard Report as the same basic soils information possessed by the state. As the introductory

---

13. We note that this passage conflicts slightly with Ballard's testimony that he assumed that the top 10 feet of sediments would be of "the finer type of material." On the other hand, Ballard's testimony did not rule out the possibility that boulders or cobbles might appear in the top 10 feet.

844

paragraph to § 2 of the report makes clear, Ballard was specifically commissioned to upgrade and expand upon the data compiled by an anonymous scuba diver. (Apparently this was the diver retained by George Silides, since there is no evidence in the record to suggest any other scuba diver reported to the state on the character of the bottom sediments.)[14] In this context, we fail to see any misrepresentation in the state's distributing only the Ballard report unaccompanied by the older and less detailed Galliett & Silides report.

### III

### AWARD OF ATTORNEY FEES TO THE STATE

■ To recapitulate, the lower court awarded the state its costs, including attorney fees in the amount of $22,633.91. Appellant argues that the state should receive costs no greater than the equivalent to the hourly salary of the highest paid assistant attorney general who worked on the case, multiplied by the number of hours allowed by the trial court. We find appellant's computations intriguing but unpersuasive.

Alaska Civil Rule 82(a)(1) sets out an attorney fee schedule which must be adhered to "[u]nless the court, in its discretion, otherwise directs." In the event of no recovery, "attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount."

Applying this rule in Froelicher v. Hadley, 442 P.2d 51, 53 (Alaska 1968), this

Court looked for "a result that did not exceed the bounds of reason":

"It would be necessary to show that what [the trial judge] did was *manifestly unreasonable* before there would be a case of abuse of discretion." (emphasis added)

More recently, in Palfy v. Rice, 473 P.2d 606 (Alaska 1970), we reaffirmed the *Froelicher* manifestly unreasonable standard.[15] In that case, where the prevailing party did not recover a money judgment after "a factually complex case which required extensive preparation", 473 P.2d at 613, we held that an award of attorney fees of only $3,700 was unreasonably *low* and manifestly abusive of discretion. 473 P.2d at 614.

The record instructs us that this case has been pending for over four years, involved potential liability of over $500,000, and culminated in a 5-day trial. Inasmuch as we do not accept appellant's implicit argument that multiplying hourly salary by billable hours is the only permissible formula for an attorney fee award where the state is a party litigant, and finding no abuse of discretion on the face of the award, we must allow it to stand.

Affirmed.

FITZGERALD, J., not participating.

BOOCHEVER, Justice, with whom ERWIN, Justice (joins dissenting).

Were this case confined to the initial bidding procedures, I would be inclined to agree with the majority for the reason that Morrison-Knudsen could have made the same investigation as other bidders in

14. The only other scuba diver mentioned in the record was the one brought over from Wrangell Narrows by Gorton in 1963.
Ballard testified that the state's representatives never mentioned the Galliett & Silides report. His report, however, appears to be conclusive on the question that he had been informed of *some* prior investigation of the area.

15. "As indicated by the rule, the matter of awarding attorney's fees is committed to the discretion of the trial court. We shall interfere with the exercise of that discretion only where it has been abused. An abuse of discretion is established where it appears that the trial court's determination as to attorney's fees was manifestly unreasonable." 473 P. 2d at 613 (footnotes omitted).
*See also,* Malvo v. J. C. Penney Company, Inc., 512 P.2d 575 (Alaska 1973); Hart v. Wolff, 489 P.2d 114, 119 (Alaska 1971).

ascertaining the impossibility or undesirability of hydraulic dredging. A different situation arose, however, after all bids were found to be too high and the contract was negotiated with M–K.

At that time the state had information from both S. S. Mullen, Inc. and Marquand S. Gorton that hydraulic dredging was not feasible. Moreover, Albert W. Wilson, the resident engineer at the project who took part in the negotiations with M–K on behalf of the state, had previously participated in an investigation of the proposed dredging areas with S. S. Mullen, Inc. That investigation had revealed that hydraulic dredging could not be accomplished.

While armed with this information, the state officials were advised by Mr. Erickson that M–K intended to perform the contract by means of hydraulic dredging. In fact, he presented M–K's dredging subcontract to the State Engineer.

The court below found that M–K could have discovered the adverse information by conducting a proper inspection of the site; and, based on the evidence, I agree that such finding is not erroneous.

Admitting that fact, we are thus presented with the question of whether the state, having specific information that hydraulic dredging was not feasible, and having been informed that M–K intended to perform the contract by utilizing that method of obtaining fill, could conduct negotiations leading to execution of a contract without informing M–K of the adverse circumstances. I doubt that my colleagues would have difficulty resolving the question if the same issue was presented in the context of a non-public contract. To illustrate, we can place M–K in a different role, having advance information that hydraulic dredging was impossible, and then entering into a subcontract (containing all provisions here relevant) with a dredging corporation to furnish M–K fill material. If the dredging corporation had advised M–K that it intended to use hydraulic dredging, I do not think we would permit M–K to have the advantage of its bargain even though the dredging company could reasonably have discovered the adverse information by making an adequate investigation. Candor and fair dealing would require revelation of the adverse facts, and certainly the state in negotiating an agreement vis-à-vis a contractor should be held to no lesser standard.

The principal is set forth in the Restatement of the Law, Contracts § 471, pages 891–92, as being the equivalent of fraud, as follows:

> "Fraud" in the Restatement of this Subject unless accompanied by qualifying words, means . . .
>
> (C) non-disclosure where it is not privileged, by any person intending or expecting thereby to cause a mistake by another to exist or *to continue*, in order to induce the latter to enter into or refrain from entering into a transaction; except as this definition is qualified by the rules stated in § 474 (emphasis added).

While I do not imply that there was an actual intent to defraud, the state had every reason to expect that M–K's mistake as to the feasibility of hydraulic dredging would continue, and that M–K could be induced to enter into the contract on the negotiated terms by reason of that mistake.

The majority cites no case to support its position but relies on attempts to distinguish three cases which are decided in favor of the contractors.[1] It is argued

1. Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963); Aerodex, Inc. v. United States, 417 F.2d 1361, 189 Ct.Cl. 344 (1969); Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364, 198 Ct.Cl. 472 (1972).

that M–K could have discovered the adverse information, and therefore that the state did not know more than "the bidders did or could."

But as indicated above, the holding in each of the cases was against the government. The case closest to the factual situation confronting us illustrates the fallacy in analysis. In Aerodex, Inc. v. United States,[2] the government sought bids to provide probe thermistor mounts. Thermistor resistors were the principal component, and drawings accompanying the invitation to bid indicated that the resistors were to be Western Electric Company's ("WE") part no. GA51387 "or approved substantial equal". The resistors were the only components of 35 elements the material contents of which were not described in the contract documents.

Aerodex expected to be able to secure the specifications from the government and to manufacture them. But it neither made inquiry of the government as to the availability of the material specifications nor sought price information from W–E regarding the units. When W–E refused to release the specifications to which they claimed a proprietary right and sought to charge an exorbitantly high price for the resistors, Aerodex sought relief. Eventually, agreement was reached with the government for use of resistors manufactured by another firm but at a substantially higher price than Aerodex had anticipated as the cost of manufacturing the units.

Despite the admitted fact that Aerodex could have made inquiry, and ascertained the price that W–E would charge and the unavailability of material specifications for manufacture of the parts by Aerodex, it was held entitled to recover. The court balanced the fault of the government in

not furnishing the information with that of Aerodex in not making adequate inquiry, stating:

> Under these circumstances, in order to avoid an erroneous impression to bidders, it was a more grievous fault for the Government not to warn bidders of the potential problem of obtaining or manufacturing resistors, than it was for the plaintiff to fail to make advance inquiry. . . .

> The sorting out of duties arising from the conflict between the plaintiff's assumption of risk in bidding on a contract without thorough inquiry, and the obligation of the Government to disclose factors of substantial influence on contract performance depend on the three general situations producing the problem: The Government may know but conceal, or not know and not be charged with knowing, or not know yet be legally charged with the knowledge because of its superior opportunity (or other factors warranting a bidder's reasonable expectations). The earned consequences in the first and second instances are predictable, but in the third the responsibility should be determined on the basis of the balance of fault and reasonable expectations, with the outcome dependent on the particular circumstances of the individual case (footnote omitted).[3]

The case before us comes under the category where the government knows of misinformation on the part of the contractor and conceals what it knows despite specific information that the contractor was intending to proceed on the basis of that misinformation.[4] I agree with the Court of Claims that the earned consequences of such conduct should be predictable. But if a weighing process is required, "the balance of fault and reason-

---

2. 417 F.2d 1361, 189 Ct.Cl. 344.

3. 417 F.2d 1367–1368.

4. There is no dispute over the fact that when renegotiating the contract the state's agents knew that M–K intended to proceed by means of hydraulic dredging and that such a method was not feasible. The failure to reveal that information to M–K constituted concealment. We agree with M–K that the trial court erred by finding no inference of concealment.

able expectations" obviously tips the scales in favor of affording relief to the contractor.[5]

Accordingly, I would reverse the judgment as to liability and would remand for further proceedings to ascertain damages.[6]

5. Similarly in City of Salinas v. Souza & McCue Construction Co., 66 Cal.2d 217, 57 Cal.Rptr. 337, 424 P.2d 921 (1967), reh. denied (1967), the alleged failure of the contractor to examine the site carefully was held not to bar recovery for extra costs incurred as a result of the city's concealment of adverse conditions known by its chief engineer.

6. Since the trial court found that the dredgeable areas depicted on the contract documents were in fact dredgeable by means of clam shell dredging, the measure of damages would be the difference between the costs of hydraulically dredging and the lesser of either the costs actually incurred by M–K or which would have been incurred by clam shell dredging.